**UNITED STATES of America,**
**Appellee,**

v.

**Joseph P. RYAN, Defendant-**
**Appellant.**

**No. 322, Docket 23546.**

United States Court of Appeals
Second Circuit.

Argued May 11, 1955.

Decided July 1, 1955.

Certiorari Granted Oct. 17, 1955.
See 76 S.Ct. 103.

---

15. 9 Wigmore Evidence § 2567 (3d ed. 1940).

**418**

Defendant-Appellant, Joseph P. Ryan, President of the International Long-shoremen's Association (hereafter called ILA) was indicted, under 29 U.S.C.A. § 186(b) and (d)—61 Stat. 302(b) and (d)—on three counts, in that, on three separate occasions, he unlawfully, wilfully and knowingly received sums in the aggregate of $2,500, from corporations employing members of the ILA. With the consent of defendant, the case was tried without a jury. There was evidence that, on three occasions during 1950 and 1951, when defendant was president of the ILA and its Atlantic Coast District, he was visited by James C. Kennedy, president of Daniels & Kennedy, Inc., and of J. Arthur Kennedy & Son, Inc., and was given envelopes containing money. There was also evidence that the two corporations headed by Kennedy employed longshoremen who were members of the ILA. The trial judge found that the defendant knew he was receiving money, knew that he was receiving it from one who employed workers represented by the union of which he was president, and knew he was receiving it because he was a union official. The judge, holding defendant guilty on all counts, 128 F.Supp. 128, sentenced him to imprisonment for six months on each count (the sentences to run concurrent-

ly) and fined him $2,500. Defendant has appealed.

61 Stat. 136–162, The Labor Management Relations Act (the so-called Taft-Hartley Act) was enacted in 1947. Section 101 of that Act amended the National Labor Relations Act originally enacted in 1935. Section 2 of the National Labor Relations Act, as thus amended, reads in part as follows: "When used in this Act * * * (4) The term 'representatives' includes any individual or labor organization." 61 Stat. 137, 29 U.S.C.A. § 152.[1]

Section 501 of the 1947 Act, 61 Stat. 161, reads in part as follows: "When used in this Act * * * (3) The terms 'commerce', 'labor disputes', 'employer', 'employee', 'labor organization', *'representative'*, 'person', and 'supervisor' shall have the same meaning as when used in the National Labor Relations Act as amended by this Act." 29 U.S.C.A. § 142.[2]

Section 302 of the 1947 Act, 61 Stat. 157–158, reads as follows:

"Restrictions on payments to employee representatives

"(a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce.

"(b) It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value.

"(c) The provisions of this section shall not be applicable (1) with respect to any money or other thing of value payable by an employer to any representative who is an employee or former employee of such

---

1. In fact, this provision continued unchanged the definition of "representa-

tives" contained in the N.L.R.A. before its amendment in 1947.

2. Emphasis added.

employer, as compensation for, or by reason of, his services as an employee of such employer; (2) with respect to the payment or delivery of any money or other thing of value in satisfaction of a judgment of any court or a decision or award of an arbitrator or impartial chairman or in compromise, adjustment, settlement or release of any claim, complaint, grievance, or dispute in the absence of fraud or duress; (3) with respect to the sale or purchase of an article or commodity at the prevailing market price in the regular course of business; (4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided,* That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner; or (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of the employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities.

"(d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both.

"(e) The district courts of the United States and the United States courts of the Territories and possessions shall have jurisdiction, for cause shown, and subject to the provisions of section 17 (relating to notice to opposite party) of the Act en-

titled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes', approved October 15, 1914, as amended (U.S.C., title 28, sec. 381), to restrain violations of this section, without regard to the provisions of section 6 and 20 of such Act of October 15, 1914, as amended (U.S.C., title 15, sec. 17, and title 29, sec. 52), and the provisions of the Act entitled 'An Act to amend the Judicial Code and to define and limit the jurisdiction of courts sitting in equity, and for other purposes', approved March 23, 1932 (U.S.C., title 29, secs. 101–115).

"(f) This section shall not apply to any contract in force on the date of enactment of this Act, until the expiration of such contract, or until July 1, 1948, whichever first occurs.

"(g) Compliance with the restrictions contained in subsection (c) (5) (B) upon contributions to trust funds, otherwise lawful, shall not be applicable to contributions to such trust funds established by collective agreement prior to January 1, 1946, nor shall subsection (c) (5) (A) be construed as prohibiting contributions to such trust funds if prior to January 1, 1947, such funds contained provisions for pooled vacation benefits." 29 U.S.C.A. § 186.[3]

Waldman & Waldman, New York City (Louis Waldman, Seymour M. Waldman and Martin Markson, New York City, of counsel), for appellant.

J. Edward Lumbard, New York City (Arnold Bauman, George H. Bailey, New York City, of counsel), for appellee.

Before HAND, SWAN and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. Defendant correctly asserts that there was no evidence of extortion (or the like). Accordingly, he argues thus: Previous to the enactment of Section 302

(b), extortion had already been covered by the so-called Anti-Racketeering Act, 18 U.S.C. § 1951; section 302(b) should not be construed to include the receipt of money or property, absent extortion, since then it would be, or come close to being, void for vagueness, and a court should, if possible, avoid an interpretation of a statute that would make it void or put it on the edge of the unconstitutional.

Defendant also argues that Section 302 (b) should not be construed to include representatives of unions because then it would overlap state statutes. Here defendant cites Jerome v. United States, 318 U.S. 101, 104–105, 63 S.Ct. 483, 486, 87 L.Ed. 640, where the Court said: "Since there is no common law offense against the United States * * *, the administration of criminal justice under our federal system has rested with the states, except as criminal offenses have been explicitly prescribed by Congress. We should be mindful of that tradition in determining the scope of federal statutes defining offenses which duplicate or build upon state law. In that connection it should be noted that the double jeopardy provision of the Fifth Amendment does not stand as a bar to federal prosecution though a state conviction * * * has already been obtained. * * * That consideration gives additional weight to the view that where Congress is creating offenses which duplicate or build upon state law, courts should be reluctant to expand the defined offenses beyond the clear requirements of the terms of the statute."

We have not found it necessary to consider either of those contentions, since we rest our decision on another ground.

2. Defendant's principal argument is that he was not a "representative of any employees" within the meaning of Section 302(b). *His reasoning is as follows:*

Section 501(3) provides that "when used in this Act, the term 'representative' is to have the same

---

**3.** The references to the National Labor Relations Act are clearer in 61 Stat. 136–162 than in 29 U.S.C.

meaning as when used in the National Labor Relations Act as amended by this Act." Section 2 of the National Labor Relations Act, as thus amended, provides that, when used in that amended Act, the "term 'representative' includes any individual or labor organization." 29 U.S. C.A. § 152(4).

Throughout the N.L.R.A., as thus amended, "representative" is used, with reference to a representative of employees, as a word of art, to mean solely a labor organization or an individual (or individuals) designated by a majority of the employees, in an appropriate unit, as their exclusive bargaining representative.

This interpretation of "representative" in Section 302(b) is in complete accord with the primary purpose of Congress in enacting Section 302 as an entirety, i. e., to render unlawful the creation of union welfare funds unless restricted as provided in Section 302(c) (5).

In the case at bar, a union, ILA, was the exclusive bargaining representative. Consequently, here Section 302(b) could apply to the union only, not to defendant who was but a representative of the representative, i. e., of the union.

Accordingly, defendant did not violate Subsection 302(b).

The government, on the other hand, contends that "representative" in Subsection 302(b) must be given its everyday, commonplace meaning; that, therefore, it includes a representative of a union; and that defendant comes within that definition. If Subsection 302(b) stood alone, that contention would be highly persuasive.[4]

That subsection, however, is not an island but part of a statutory continent. To understand the words "representative of any employees" in Subsection (b) of Section 302, we must look to Section 501(3) which instructs us that "representative" in Section 302(b) has the same meaning "as when used in the National Labor Relations Act as amended * * *." In Section 2(4) of that Act, we find the "term 'representatives' includes any individual or labor organization." We thereby learn what "representative" includes. To understand what it means, with reference to a "representative of any employees," we must heed Section 501(3) and turn to the many sections of the amended N.L.R.A. where "representative" is so used.[5] We discover that there invariably it means a "representative" selected by a majority of the employees, in an appropriate unit, as their exclusive bargaining representative. (Only once is it used otherwise, i. e., in Section 2(1) where, defining "person," the Act includes a "legal representative".) The question then arises whether an "individual" can be an exclusive bargaining representative. Clearly he can. The Labor Board has so interpreted the Act.[6]

We see nothing in the exception clauses of Section 302(c) at all at odds with defendant's contention: Clauses (2), (4) and (5) obviously are not. Clauses (1) and (3) apply to an individual employee who is also an exclusive bargaining agent —and thus himself a "representative." We think it significant that when, in the 1947 Act, Congress wanted to refer to individuals acting for a union, it spoke of them not as "representatives" of a "labor organization," but as "agents" of such an organization; see Section 8(b)

---

4. If, however, we accepted that interpretation, we would have to consider defendant's argument noted in point I of this opinion.

5. See Sections 1, 2, 7, 8(a) (3), 8(a) (5), 8(b), 8(b) (4), 8(d), 9(a), 9(b), 9(c) (1) and 9(g).

6. See The Robinson-Ransbottom Pottery Company, 27 NLRB 1093 (1940); The Louisville Sanitary Wiper Company, Inc., 65 NLRB 88 (1945). These cases arose under the N.L.R.A. before its amendment in 1947; but that amendment did not change the statutory definition of "representative."

—61 Stat. 141—of the amended N.L.R.A., a subsection added by the 1947 Act.

The government argues that, in every instance where "representative" is used in the amended N.L.R.A. to designate a "representative" of employees, the word is qualified by the word "bargaining" or by the phrase "subject to Section 9(a)." That is not true: Section 8(b) (4) (B) and Section 8(d)—61 Stat. 141–142—use the words "representative of his employees" or "representative of the employees" without any qualification, and Section 1, 61 Stat. 137, and Section 7, 61 Stat. 140, speak of "representatives of their own choosing".

The following further suggestion is advanced: (1) As defined in Section 2(5) of the N.L.R.A.,[6a] "labor organization" can be interpreted to cover not only an exclusive bargaining agent but also either any group or any individual whatever to whom any employees give authority to deal with their employer "concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." (2) Accordingly, since Section 2(4) provides that "representatives" include "any individual or labor organization", an individual who is not an exclusive bargaining agent can be a "representative."

We reject that suggestion for these reasons: (1) It involves a straining of the language of Section 2(5) to have the term "labor organization," which normally imports a collective body or group, cover an individual. (2) More important, if "labor organization" includes an individual, then Section 2(4) uses the word "individual" redundantly when it says that "representatives" include "any individual or labor organization." For the suggested interpretation of Section 2(4) would cause it to read, in effect, thus: "The term 'representatives' include (a) an individual or (b) an individual or a group having authority from any employees to deal with their employer."

3. The government makes much of the legislative history. But, so far as it illuminates, it tends strongly to support defendant's contention. This appears from the following:

A forerunner of the 1947 Act was the so-called Case Bill, H.R. 4908, reported on the floor of the House of Representatives on January 28, 1946 (92 Cong.Rec. 490). After this bill passed the House, on February 7, 1947 (Cong.Rec. 1069, 1118), the Senate Committee reported it on April 15, 1946. On May 16, 1946, Senator Byrd submitted an amendment (92 Cong.Rec. 4809) entitled "Restrictions on Payments to Labor Organizations." This Byrd amendment (except for the definition of "representative" noted infra) is substantially the same as the present Section 302. The Case Bill, including the Byrd amendment, was passed by Congress but was vetoed by the President, and Congress failed to overrule the veto.

One year later, as part of the comprehensive labor bill then under consideration, an amendment similar to the Byrd amendment was introduced in the House but failed of passage. The Senate Labor Committee reported out the comprehensive labor bill without any such amendment. However, five members of that Committee, including Senators Taft and Ball, filed a Supplemental Report (to the Committee's report) in which they urged an amendment quite like the Byrd amendment of the previous year. On May 7, 1947, Senator Ball, for himself and three other Senators, introduced the amendment on the Senate Floor (93 Cong.Rec. 4667), and it was adopted as Section 302 of the Senate bill.

Like the Byrd amendment, Section 302, as adopted by the Senate, included the following subsection (g):

6a. This subsection reads as follows: "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and: which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

"For the purposes of this section, the term 'representative' means any labor organization which, or any individual who, is authorized or purports to be authorized to deal with an employer, on behalf of two or more of his employees, concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work; and for the purposes of section 301 includes any other organization or fund of which some of the officers are representatives or are members of a labor organization or are elected or appointed by a representative."

This definition was susceptible of the interpretation that "representative" included a union official. Senator Ball, explaining that paragraph, (g), said (93 Cong.Rec. 4678): "Subsection (g) is simply a definition of the term 'representative' as used in the section, which is required to be somewhat different from the definition of 'representative' in the National Labor Relations Act."

But the Joint Conference Committee, which ironed out the differences between the House and Senate bills, significantly omitted that definition and, instead, added the word "representative" to the list of terms defined by Section 501(3) as having the same meaning as when used in the amended N.L.R.A. In this form, the bill passed both houses of Congress and was enacted over a Presidential veto.

Before the Joint Conference Committee made that change, Senator Ives, in debate, had said: "\* \* \* I \* \* \* should like to point to section (b) \* \*. I wish to inquire whether that could be construed in any way as affecting Christmas presents or birthday presents or anything of that type. The language is rather broad, and it appears to me to be vague." (93 Cong.Rec. 4748.) Senator Ives later was a Senate member of the Joint Conference Committee which made the change.

Most of the Congressional debates and Committee reports concerning Section 302, and concerning the Byrd amendment in the previous Congress, were devoted to the subject of the regulation of union welfare funds. They show that this section was prompted by the demand of the United Mine Workers Union for an employer contribution to a welfare fund of 10¢ per ton of coal, a fund administered by the union alone with no restrictions on its discretion.[7] The following statements from the debates on the Ball amendment are illustrative:

(Senator Ball): "Mr. President, the pending amendment deals with so-called welfare funds, which are becoming increasingly prominent in negotiations between unions and employers. \* \* \* Mr. President, the sole purpose of the amendment is not to prohibit welfare funds, but to make sure that they are legitimate trust funds. \* \* \*" (93 Cong.Rec. 4678).

(Senator Byrd): "It [the amendment] has a specific purpose, which is to prohibit the labor unions from requiring welfare funds to be paid into the treasuries of the labor unions." (93 Cong. Rec. 4678.)

(Senator Taft): "The occasion of the amendment was the demand by the United Mine Workers of America that a tax of 10¢ a ton be levied on all coal mined, and that the tax levied be paid into a general welfare fund to be administered by the union for practically any purpose the union considered to come within the term 'welfare.' \* \* \* The purpose of the amendment is to require that the fund shall be established in definite detailed form. \* \* \* The purpose is to prevent the abuse of welfare funds. \* \* \* This amendment is, in effect, a provision to prevent the abuse of the right to establish such funds by collective bargaining. \* \* \*" (93 Cong. Rec. 4746–47).

Sen.Rep. 105 on S. 1126, Supplemental Views, p. 52 (Senators Taft, Ball, Donnell, Jenner, H. Alexander Smith): "Limitation on Abuse of Welfare Funds. \* \* \* The necessity for the amendment

---

7. Also discussed was a limitation on check-offs to labor organizations.

was made clear by the demand made last year on the part of the United Mine Workers. * * * "

The government points to a few isolated expressions in the Supplemental Report in 1946, and during the debates in 1946 and 1947,[8] indicating that Section 302(b) may have been intended (1) to apply to union representatives and (2) to cover extortion.[9] Those relative to "extortion" can be read as characterizing such demands on employers as those made by the United Mine Workers for the establishment of unregulated union trust funds. Thus when Senator Taft (93 Cong.Rec. 4746) mentioned "a case of extortion or a case where the union representative is shaking down the employer," the context suggests that he had in mind the alleged practice of some unions of bargaining for their own benefit rather than for the benefit of the employees they represented. These unions would exert marked pressure to gain employer contributions to an uncontrolled fund; it was said that such funds would then be used as union "slush" or strike funds. The grant of such employer contributions, it was urged, would be accepted by the union as the price of a collective bargaining agreement in lieu of other benefits which the workers should have received. This fear was expressed by Senator Ball, in introducing his amendment, as follows:

"Mr. President, the sole purpose of the amendment is not to prohibit welfare funds, but to make sure that they are legitimate trust funds, used actually for the specified benefits to the employees of the employers who contribute to them and that they shall not degenerate into bribes. * * * I have heard of many cases in which unions have even relinquished wage demands in order to secure a welfare fund with a percentage of the payroll paid into the welfare fund established, and employers have frequently agreed to that procedure." (93 Cong.Rec. 4678 (1947.)

In any event, the significant fact is that all those expressions occurred before the Joint Conference Committee had deleted paragraph (g) of Section 302 (above quoted) separately defining "representatives," and had substituted the definition now contained in Section 501.[10]

 Since defendant was not a "representative" within Section 302(b) as we interpret it, we reverse with directions to dismiss on the merits.

Reversed.

HAND, Circuit Judge (dissenting).

As my brothers say, § 142(3) of Chapter 29, U.S.Code, which is part of Subchapter I of the "Labor-Management Relations Act, 1947," defines the term, "representative," by reference to its use in Subchapter II—the National Labor Relations Act. It also defines "labor organizations" in the same way. Although the word, "representative," is repeatedly used in Subchapter II, I can find no definition of it anywhere except that § 152 (4) says that it includes "any individual or labor organization"; from which it follows that the Act understands that

---

8. Many of them emanated from Senators or witnesses interested in defeating Section 302.

9. The Supplemental Report (1946) said: "The amendment makes extortion illegal."
 Senator Taft in 1947 (93 Cong. Rec. 4746) spoke of "a case of extortion or a case where the union representative is shaking down the employer."

10. The Joint Conference Committee reported that Section 302 of the Senate bill "was adopted with minor clarifying changes." We see no conflict between the significance we have attached to the changes made by that Committee and the report's description of those changes as "minor." For, in relation to the general purpose of the section—the regulation of union welfare funds—the changes are of little import, and only if the Section is applied to other kinds of payments do they assume importance.

"representatives" of employees may be other than a "labor organization." Section 152(5) defines a "labor organization" as "any organization of any kind" (which I take to require a group of individuals) "or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." I should suppose that, read as it should be as in contrast to "any organization of any kind," this last language would include an individual to whom employees give authority to deal with their employer. Therefore I cannot see any escape from saying that a single person may be a "labor organization"; and, if so, then there may be "individuals" who are "representatives" of employees and yet who are not authorized to negotiate with employers. Hence, I can see no reason for denying what to me is the natural meaning of "representative," which would cover any official, or at any rate the president, of a union. Of course § 186 might still be confined to payments made into the union treasury, but that must be for other reasons than that they are payments to a "representative." I of course agree that the section does cover payments into the union treasury (subsections (c) (4) and (c) (5) prove that), but the accused must go further, and does; for he argues that the section covers no payments but those made in the course of negotiation and to a bargaining agent of the union for the union. But I start with the premise, that, so far as concerns definitions, there is no reason why we should not understand the word in its ordinary sense; and it is certainly irrelevant that the Act uses it in most instances—for example, in § 158(d)—in a limited sense.

However, I go further, because I find evidence in subsection (c) that it does not exclude union officials, though they are not engaged in bargaining. That subsection is the provision that excepts payments which without it would fall within subsections (a) and (b). Subsections (c) (4) and (c) (5) are indeed confined to payments made to a union, and I think that the same is true of subsection (c) (2), although that is not quite so certain. On the other hand subsections (c) (1) and (c) (3) presuppose that § 186 covers payments into the pocket of a union official for his own use; because, since, as I have just said, the purpose of subsection (c) is to state exceptions to the preceding subsections (a) and (b), the payments that subsection (c) covers would fall within (a) and (b) except for the exception. Hence, subsections (a) and (b) do cover payments not made into the union treasury, but directly to a "representative," who need not himself have any authority whatever to negotiate for the union. The accused answers that these subsections are only to protect those, who may be negotiating for the union, when they take their wages or have an ordinary market transaction with the employer. So far as the "representatives" are only the bargaining agents of a union, that construction makes the subsections only cautionary, and does not answer the objection that, not only are they called exceptions, but they are indiscriminately mixed with indubitable exceptions. On the other hand, if they are treated as true exceptions (as they may be if confined to cases where the individual negotiators are themselves the union) although the formal difficulty is avoided, the occasions on which the subsections would apply are so much reduced that it is most unlikely that Congress would have thought it worth while to provide for them. It must very rarely be true that one or two or three individuals are in fact a "labor organization"; and it is substantially impossible, I submit, that Congress would have deemed the possible accumulation of the union funds of such "labor organizations" an appreciable evil. For the foregoing reasons I do not think that there is the least textual reason to confine § 186 to payments made to union "repre-

sentatives" into the union treasury as a result of bargaining negotiations.

As I have said, that was indeed one of the objects of the Act, and it was particularly present in the mind of Congress at the time, for in 1947 the "Mine Workers Union" was attempting to collect a large "war chest." But that does not mean that prevention of such accumulations was the only object of the Act. Moreover, in order to affirm the conviction it is not necessary to suppose that § 186 was directed against the bribery of union officials, although, if I am right, it certainly does cover bribery. (Incidentally, if bribery had been the target, the penalty would almost certainly have been more than a year's imprisonment.) An altogether adequate purpose, and one which does not involve the textual difficulties I have discussed, is that in addition to preventing employers from helping to fill a union's "war chest," Congress wished to prevent employers from tampering with the loyalty of union officials, and disloyal union officials from levying tribute upon employers. The first was the situation at bar; the employer did not bribe the accused; it did what has been done, time out of mind, when one person, knowing that he is likely to have continuous dealing with another, in which the second person will be acting as a fiduciary, wishes to insure a friendly approach to the fiduciary; and makes him presents or does him favors, or in other and less palpable forms tries to turn the edge of his allegiance. Although § 186 deals only with the grosser forms of this evil, it presupposes a more than ordinary fiduciary defection. A union official has a double loyalty: first, he owes it to the members of his union, who have chosen him to represent them; next, he owes it to those employees, who are not members, but in favor of whom the law has nevertheless imposed on him an equal duty. Surely, it was altogether likely that Congress should wish to put an end to such abuses by both parties—the unions and the employers.

Last is the question of the history of the section's passage through Congress. The principal discussion was indeed about contributions to a union's treasury; and that was true as well of the "Case Bill,"—the predecessor of the Act before us—as of the Act itself. The absence of much discussion about preventing the kind of offence here prosecuted, seems to me not at all surprising; there could have been no opposition to it, except that in fact made: it might cover innocent payments. Besides, the question here at issue did not wholly escape notice. Take, for example, what Senator Taft said about § 186(a): "That is, it may be said, in a case where the union representative is shaking down the employer." Or consider Senator Ives's inquiry whether § 186(b) "could be construed in any way as affecting Christmas presents, birthday presents or anything of that type." Both he and Senator Pepper voted against the bill, presumably because they thought that for this reason it went too far. I do not forget that the section defining "representative," was at that time more specific than § 142(3), which eventually supplanted it in conference; but the amendment makes rather against the accused than in his favor, if we treat subsections (4) and (5) of § 152 as incorporated in § 142(3). For, although the supplanted section did contain the word "individual," as well as "labor organization," it limited it to an "individual" who was, or claimed to be, authorized to deal with an employer; and § 152(4) does not do so, as I have said.

However, even if the debates threw more light than they do on the meaning of the words, I should hesitate to accept them as an authoritative gloss. It is one thing to look for that purpose to the reports of one or both of the Houses of Congress; for it is not unreasonable to believe that those members, who are not content to let the words speak for themselves, may have relied upon the report as authoritative; and in any event that

is well settled law.[1] On the other hand, although it is true that courts have repeatedly mentioned the debates that attended the passage of a bill as relevant to its interpretation, the decisions are so much at variance that I find it impossible to extract any safe principle. The words of the sponsor of a bill are presumptively entitled to be considered,[2] although it is impossible to know how far those who voted for it may have acted on the faith of them; but the remarks made in general debate are not to count.[3]

There does indeed remain the question raised by Senator Ives and Senator Pepper: i. e., whether § 186 forbids a Christmas present to a union official who chances to be a friend, or even a relative, of the employer. To draw lines is always difficult; and the one sure way to miss the meaning of a statute is to read the words out of their context and as you find them in the dictionary. Nearly every statute has its penumbra, and this one is not an exception; but it would be most unreasonable to defeat a part of its purpose, because there is no a priori rule for deciding when a payment was purely donative, and when it was actuated by the prospect of possible benefits to come.

As my view is not to prevail, I shall not discuss the other objections that the accused raises, except to say that I have considered them, and that they have not convinced me that any error was committed that would justify a reversal. I would affirm the conviction.

1. Binns v. United States, 194 U.S. 486, 495, 24 S.Ct. 816, 48 L.Ed. 1087; Lapina v. Williams, 232 U.S. 78, 90, 34 S.Ct. 196, 58 L.Ed. 515; United States v. St. Paul, M. & M. Ry., 247 U.S. 310, 318, 38 S.Ct. 525, 62 L.Ed. 1130; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 474, 475, 41 S.Ct. 172, 65 L. Ed. 349; Wright v. Vinton Branch, etc., 300 U.S. 440, 463, 464, 57 S.Ct. 556, 81 L.Ed. 736; Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394, 395, 71 S.Ct. 745, 95 L.Ed. 1035.

2. United States v. St. Paul, M. & M. Ry., supra, 247 U.S. 310, 318, 38 S.Ct. 525; Duplex Printing Press Co. v. Deering, supra, 254 U.S. 443, 474, 475, 41 S.Ct. 172; McCaughn v. Hershey Chocolate Co., 283 U.S. 488, 493, 494, 51 S.Ct. 510, 75 L.Ed. 1183; United States v. Great Northern Ry., 287 U.S. 144, 154, 155, 53 S.Ct. 28, 77 L.Ed. 223; Wright v. Vinton Branch, supra, 300 U.S. 440, 463, 464, 57 S.Ct. 556; Schwegmann Brothers v. Calvert Distillers Corp., supra, 341 U.S. 384, 394, 395, 71 S.Ct. 745.

3. United States v. Trans-Missouri Freight Association, 166 U.S. 290, 318, 319, 17 S.Ct. 540, 41 L.Ed. 1007; Dunlap v. United States, 173 U.S. 65, 75, 19 S.Ct. 319, 43 L.Ed. 616; Lapina v. Williams, supra, 232 U.S. 78, 90, 34 S.Ct. 196.