NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

EVERBRITE ELECTRIC SIGNS, INC., Respondent.

No. 76–1340.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1976.

Decided June 24, 1977.*

---

* This appeal was originally decided by unreported order on June 24, 1977. See Circuit Rule 35 (formerly Circuit Rule 28). The court has subsequently decided to issue the decision as an opinion.

**406**

Elliott Moore, Deputy Associate Gen. Counsel, John D. Burgoyne, Joseph A. Oertel, Attys., N. L. R. B., Washington, D. C., for petitioner.

John H. Wessel, Milwaukee, Wis., for respondent.

Before MOORE, Senior Circuit Judge,** and SWYGERT and TONE, Circuit Judges.

PER CURIAM.

In this case the National Labor Relations Board petitions for enforcement of its order finding the respondent Everbrite Electric Signs, Inc. in violation of § 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5). That order required the company to cease and desist from bargaining with individual employees, and instead to bargain with their union regarding merit increases in pay, changes in job descriptions, and the hiring of new employees at wage rates above those set by the collective bargaining agreement then in force. For the reasons set forth below, we grant enforcement.

** The Honorable Leonard P. Moore, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit is sitting by designation.

1. The list consisted of eight individuals; a ninth employee, whose raise was effective after the list was provided but before the hearing, was added on the General Counsel's application. Cross-examination of the company's manufacturing manager, Arthur Sobczak, revealed that

The company manufactures and sells plastic, neon, and electric signs at the plant involved in this proceeding. Employees in the plastics department of the plant, roughly 125 in number, are represented by Local 1172 of the United Electrical Radio and Machine Workers of America. The collective bargaining agreement in force at the times relevant to this appeal was executed November 2, 1973, following a six-month strike. The union later learned that the company was paying some employees at wage rates above those set in the collective bargaining agreement, and, in February 1974, it therefore requested information from the company regarding this practice. The company's initial refusal to release this information led the union to file an unfair labor practice complaint, which was dismissed once the company agreed to supply a list of employees who had received "merit increases" during the preceding one and one-half years.[1] After examining the list, the union filed the unfair labor practice charges which have resulted in the petition before us. At the conclusion of a hearing on the union's merit increase charges the General Counsel of the Board amended the complaint to add the charges regarding alterations of job descriptions and hirings at above-contract wage rates. The administrative law judge ruled against the company on all three issues; the Board adopted his decision and a modified version of his recommended order.

We begin with the proposition that merit increases are "a subject of mandatory bargaining," *NLRB v. Katz,* 369 U.S. 736, 745, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). The Supreme Court, in *NLRB v. C & C Plywood Corp.,* 385 U.S. 421, 425, 87 S.Ct. 559, 562, 17 L.Ed.2d 486 (1967), recognized the principle that

more employees may have been granted "reevaluation increases," which he stated were based on different criteria than were the "merit increases" reflected in the list. It was further shown that several former employees who had received "merit" or "reevaluation" increases or both were also omitted from the list, but Sobczak was able to recall the name of only one of these individuals.

"an employer may not unilaterally institute merit increases during the term of a collective agreement unless some provision of the contract authorizes him to do so."

See also *NLRB v. J. H. Allison & Co.,* 165 F.2d 766 (6th Cir.), *cert. denied,* 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369 (1948).

The company argues that this principle only applies where the employer grants merit increases to a significant segment of the work force, relying on a footnote in *Katz* that distinguished two prior court of appeals decisions as involving only "isolated individual wage adjustments." *NLRB v. Katz, supra,* 369 U.S. at 747 n. 14, 82 S.Ct. 1107.[2] Inasmuch as the number of employees granted increases in those two cases represented a larger proportion of the relevant bargaining units than do the nine employees apparently involved in the case before us, this argument has some force.[3] The *Katz* Court, however, was concerned with wage increases instituted unilaterally during the pendency of contract negotiations. Under established principles such increases amounted to a violation of § 8(a)(5) unless they "were a mere continuation of the status quo." *Id.* at 746, 82 S.Ct. at 1113. Accordingly, the Court emphasized that the wage increases involved in *Katz* were "in no sense automatic, but were informed by a large measure of discretion." *Id.* at 746, 82 S.Ct. at 1113.[4] The distinction between general and individual wage increases was important because, even assuming the discretionary nature of the raises instituted during negotiations on a new contract, only a general wage increase was barred by the principles of *NLRB v. Crompton–Highland Mills, Inc.,* 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949). This difference is not important, however, when merit increases instituted during the term of a collective agreement are involved. Then, as is clear from the Court's broad language in *C & C Plywood,* quoted above, the only issue is whether the contract authorizes the company to institute the pay increases unilaterally.

The company points to the general management rights clause of the contract as supporting its claim for this authority.[5] That clause cannot be so construed, however. The company's rights "to direct the working force," "to transfer employees," and "to determine . . . the methods and scheduling of production," do not encompass the authority to grant merit increases above the wage rates specified in the collective agreement.[6] Even if the language were ambiguous, any contention that it was intended to cover merit increases would be impossible, because it is admitted

2. In *White v. NLRB,* 255 F.2d 564, 565 (5th Cir. 1958), five of sixty employees were granted raises, all before bargaining commenced following certification. In *NLRB v. Superior Fireproof Door & Sash Co.,* 289 F.2d 713, 720 (2d Cir. 1961), five employees received raises, two of whom were in an eleven-man bargaining unit and the remaining three of whom were in a fourteen-man unit. One employee in the two-man unit also received a second merit increase. In *C & C Plywood* the wage increases were "across the board"; in *Katz* they went to 40 percent of the bargaining unit.

3. These nine are among 125 employees in the unit. The company's manufacturing manager, Sobczak, testified that between five and eight percent of the plastics department employees had received "merit" or "reevaluation" raises or both.

4. The record demonstrates that the merit increases in this case were also largely discretionary. Although Sobczak claimed that the company had an established policy of granting

merit increases, he admitted that the policy "was not in writing" and that there was not a "set formula" for the granting or size of such increases. The union's efforts to obtain an explanation of this policy went unanswered. Furthermore, Sobczak's assertion that "merit" and "reevaluation" raises were based on different criteria *is undercut by the confusion* regarding these raises, illustrated by the several instances in which increases were incorrectly characterized as being of one type or the other, or both, in company documents.

5. Article XXX.

6. This language is not comparable to the explicit clause quoted in *C & C Plywood,* in which the company reserved

   "the right to pay a premium rate over and above the contractual classified wage rate to reward any particular employee for some special fitness, skill, aptitude or the like."

that the parties did not negotiate at all regarding a merit increase policy. And, as we have stated before,

"[i]n order to effectuate the relinquishment of a collective bargaining right under the provisions of a collective agreement, . . . the preferable rule requires that waiver be in 'clear and unmistakable language.'"

*NLRB v. Wisconsin Aluminum Foundry Co.,* 440 F.2d 393, 399 (7th Cir. 1971).

Moreover, this aspect of the Board's order must be enforced for another reason, *viz.,* our conclusion that at least five of the merit increases resulted from the company's bargaining directly with individual employees. The testimony of Sharon Beck, a forewoman at the plant, and James Degerstedt, formerly one of the members of her production crew, demonstrates that the "merit increases" given to five members of her crew were intended as recognition of their "outstanding job" on the Conoco sign contract. Degerstedt testified that the crew had requested a pay increase in their discussions with Beck, in part because they "were working quite hard on the Conoco order," and that Beck agreed to "see what she could do." Beck acknowledged that she and her crew frequently discussed wage rates, and that she recommended the pay increase for her crew to Sobczak, the company's manufacturing manager. After the increase was approved she informed her crew that the raises were "because of the job they had been doing and especially because of the Conoco job . . . ." The employees' requests and her support as promised led to the ultimate reward of merit increases granted by the company without any union involvement. We agree that, at least in this instance, the company bargained directly with individual employees in contravention of the Act. See *Medo Photo Supply Co. v. NLRB,* 321 U.S. 678, 685, 64 S.Ct. 830, 88 L.Ed. 1007 (1944).

The other two violations found by the Board need be discussed only briefly. One, the alteration of several job descriptions without discussion with the union, is not seriously challenged by the company.[7] Article X of the detailed collective agreement provides that "[t]here shall be a job description and wage rate for each job title." (The use of the singular is not without significance.) It provides further that the union is to be notified of all new jobs or significant changes in job descriptions, and that any such changes resulting in new rates of pay "shall be subject to the Grievance Procedure." These provisions were not followed in the instances in which four "merit increases" were awarded to employees for their "increased ability" to do the same or slightly different work, or for their assistance with work outside their established job descriptions.

Finally, the Board found that the company had hired new job applicants at wage rates higher than those specified in the collective bargaining agreement. The company argues that the starting wage rates were intended only to be minimum wage rates, but the language of the agreement does not indicate such an intention. The attachments and exhibits to the contract set forth specific job descriptions and classifications, and the pay rate applicable to each seniority level in each classification. Inasmuch as the "progression schedules" are based on seniority within the plant and date of hiring, newly hired employees would begin at the bottom of their classification scale unless otherwise specified. There exists no contrary specification in the collective agreement. Indeed, these exhibits themselves state that one of the specified wage rates applies "[i]f hired on or after June 1, 1971," and the other "[i]f hired on or before May 31, 1971." It would be difficult to read this term as permitting newly hired employees to begin at higher stages of the progression scale. We therefore reject the company's argument. If new employees cannot be found to perform

---

**7.** The company's argument regarding the "re-evaluation raises" awarded to Mary Tomblyn and Pat Priess was limited to the issue of whether they were negotiated with these employees. The company's statement of facts acknowledges that these two employees were assisting the foreman in performing "administrative duties."

the jobs available at those wage rates, after the elaborate bidding procedures set forth in the contract are exhausted, then the parties should negotiate about the issue.

The Board's order is enforced in all respects.