Robert L. TYSON, Plaintiff-Appellant,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 710 PENSION FUND, Defendant-Appellee.

No. 86–1859.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1986.

Decided Feb. 12, 1987.

Stephen B. Horwitz, Burns, Sugarman & Orlove, Chicago, Ill., for plaintiff-appellant.

Stephen Feinberg, Asher, Gittler & Greenfield, Ltd., Chicago, Ill., for defendant-appellee.

Before CUMMINGS and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

POSNER, Circuit Judge.

This ERISA suit against a union pension fund seeks benefits under a pension plan. See 29 U.S.C. § 1132(a)(1)(B). The plaintiff, Robert Tyson, is a former truck driver for Charles Levy & Co. He claims to be entitled to a disability pension under the pension plan established by the collective bargaining agreement between his union (a teamsters local) and Levy. The district court granted summary judgment for the pension fund on the ground that awarding the pension would violate the Taft-Hartley Act.

On February 6, 1981, Tyson suffered a totally and permanently disabling injury in an auto accident. The pension plan entitles an employee who becomes totally and permanently disabled to a disability pension, beginning immediately, if he has worked either for 15 complete years or for 14 complete years plus a total of 35 weeks in the first and last year that he was employed. Otherwise he must wait till he reaches age 65 to realize any vested pension rights. Tyson had worked 14 complete years plus 18 weeks his first year and he therefore needed 17 weeks in his last year, 1981, to qualify for the pension. Although disabled after working only 6 weeks in 1981, he was credited for that year with an additional 8 weeks of accrued vacation and disability pay (the collective bargaining agreement requires the employer to pay the employee for 4 weeks after a disabling injury), making a total of 32 weeks in his first and last years $(18 + 6 + 8)$—which was 3 weeks short. In January 1982, almost a year after Tyson had stopped working for Levy, Levy paid him 4 weeks of additional wages

in recognition of his long years of service for Levy and the fact that his employment had been cut short by the accident. Tyson wants to add those 4 weeks to his other 1981 credits. If he succeeds, he will be entitled to the disability pension.

■ The district court thought that the addition of the 4 weeks to Tyson's 1981 credits was blocked by section 302 of the Taft-Hartley Act, 29 U.S.C. § 186, which makes it unlawful for an employer to pay a union or other representative of its employees—which the pension fund is conceded to be. There is an exception for union pension and welfare funds but it is subject to various limitations, of which the one pertinent here is that "the detailed basis on which such payments are to be made [by the employer to the fund] is specified in a written agreement with the employer." 29 U.S.C. § 186(c)(5)(B). The district judge thought this proviso not satisfied here. En route to this conclusion he expressed skepticism about most of the fund's contractual arguments, but the focus of his decision was the fund's statutory ground, and we regard the contractual issues as still open; Tyson conceded as much at the oral argument of the appeal.

Article 29 of the collective bargaining agreement, captioned "Pension Plan," requires the employer to contribute to the union's pension fund a fixed amount per week for each employee covered by the agreement who has been on the employer's payroll for at least 30 days. It also authorizes the making of "appropriate trust agreements necessary for the administration of such fund." Levy never made a contribution for the additional 4 weeks that Tyson wants credited to 1981, but the fund admits it would have refused to accept it, on the ground that accepting it would violate the statute; and the parties appear to assume that if the fund would accept the contribution, Levy would make it. The fund's position (and hence the district court's decision) is correct if "the detailed basis" for such a contribution is not "specified in a written agreement with the employer."

It is not specified in the collective bargaining agreement itself. But section 1.25 of the trust agreement that sets forth the details of administration provides:

Each Employee will be credited with an Hour of Work for:

(a) Each hour for which an Employee is paid, or entitled to payment by an Employer for duties performed....

(b) Each hour, up to a maximum of 501 hours, for which an Employee is directly or indirectly paid or entitled to payment by the Employer for reasons (such as vacation, holiday, illness, incapacity, including disability, layoff, jury duty, military duty or leave of absence) other than the performance of duties (irrespective of whether the employment relationship has terminated)....

This section makes clear that an employee such as Tyson is entitled to pension credit for certain hours that he does not actually work, even if, as here, he is paid for those hours after he has ceased to be employed. If the 4 weeks for which he was paid in 1982 are added to the 8 weeks for which he received vacation and disability pay in 1981 and which the fund does not contest, the total (12 weeks = 480 hours) is below the 501–hour ceiling.

■ The pension fund argues that section 1.25 was not meant to embrace "gifts," but there are two answers to this. The first is that the provision does not in terms exclude gifts; at least the words do not compel such a reading. The expression "for reasons ... other than the performance of duties" does not appear to require nonaltruistic "reasons"; the reasons listed between the parentheses are illustrative rather than exhaustive. Furthermore, to describe the 1982 payment to Tyson as a "gift" is surely a mistake. The world of employee compensation does not divide neatly into legally required payments on the one hand and gifts on the other. A bonus, for example, is neither; nor is severance pay; nor—what indeed is a form of severance pay—is a payment made in recognition of long years of work abruptly cut off by a tragic accident. Many of the

mutual understandings on which the effective functioning of labor markets depends are not reduced to legally enforceable commitments, because the parties don't want the uncertainty and expense of a lawsuit if they have a disagreement. See Epstein, *In Defense of the Contract at Will,* 51 U.Chi. L.Rev. 947 (1984). (As a matter of fact, employment at will remains the dominant form of employment relationship in this country.) Nevertheless those nonbinding mutual understandings are commercial rather than altruistic. It is true that when as in this case the employment relationship is defined by a collective bargaining agreement, payments to workers of compensation in excess of what the agreement specifies may, by undermining the union's status as exclusive bargaining representative of the workers, violate the National Labor Relations Act. See e.g., *NLRB v. Everbrite Electric Signs, Inc.,* 562 F.2d 405 (7th Cir.1977) (per curiam). But there is no suggestion that Levy's payment of an additional 4 weeks' wages to Tyson after he had ceased being an employee of Levy's raises any problems under the agreement and hence under the Act. Indeed, the fact that "gifts" by an employer to his unionized employees could raise problems under the Act is one more piece of evidence that the payment Levy made to Tyson in 1982 is not properly described as a gift.

A better argument for the pension fund is that since Levy had already paid Tyson the 4 weeks disability pay that the collective bargaining agreement required Levy to pay him, the additional payment in 1982 could not have been by reason of disability and therefore cannot be fitted within section 1.25. But the section is not clearly limited to payments made under legal obligation. The words "entitled to payment" might have that force; that is, they could be intended to protect the employee in the event that the employer, though contractually obligated to pay him, fails to do so. But they need not be so read; the disjunctive treatment of "paid" and "entitled to be paid" could signify that the employee was entitled to credit for money actually paid him whether or not legally due him, plus money legally due him whether or not actually paid him. The payment made in 1982 was certainly made by reason of Tyson's disability, perhaps in conjunction with his long years of service—a factor not excluded by the section, though not specifically listed in it.

The fund's best argument is that to allow a gratuitous payment to be credited would enable an employer to transfer great wealth, at small cost to itself, from the fund to a former employee. The contribution that Levy would need to make to the pension fund (if the fund would accept it) on the payment in 1982 that put Tyson over the hump is only about $200; if this payment entitled him to a pension it would mean that for a trivial outlay Levy had bought Tyson an annuity of $375 a month for the 12 years until his regular pension vests at age 65. The present value of such an annuity is on the order of $30,000. In effect, at the discretion of the employer, a 14 years and 35 weeks vesting period is lowered to 14 years and 31 weeks. (It can't be shortened much beyond this, however, because of the 501–hour limitation in section 1.25.)

These arguments are respectable and may, singly or together, in the end demonstrate that as a matter of contract interpretation Tyson is not entitled to the disability pension. (He would not be completely out in the cold; he is receiving a social security disability pension.) But they do not show that there is no "detailed basis" for a contribution by Levy, and hence that the statute bars a pension for Tyson. The detailed basis is section 1.25.

■ The existence of interpretive uncertainty does not bring section 302 of the Taft-Hartley Act into play. Section 302 was primarily designed to prevent employers from bribing union officers and union officers from extorting money from employers. *Arroyo v. United States,* 359 U.S. 419, 425–26, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959); *United States v. Ryan,* 225 F.2d 417, 426 (2d Cir.1955) (L. Hand, J., dissenting), rev'd, 350 U.S. 299, 76 S.Ct.

400, 100 L.Ed. 335 (1956); *Waggoner v. Dallaire,* 649 F.2d 1362, 1366 (9th Cir. 1981). The present case is remote from this policy. In making an additional payment to Tyson a year after the accident forced him to stop working, Levy was not trying to bribe union officers—whether in order to undermine the loyalty of the teamsters union to the teamsters employed by Levy or for any other reason. Nor was Levy being extorted to provide favors for union officers. It was merely trying to get a pension for its former employee—a pension, it is true, that would be paid for very largely by other employers; but whether or not this feature gives them a basis for squawking, or violates the collective bargaining agreement, it does not affront the purposes behind the statute.

■ Granted, a statute may have a life of its own, and because of its strict and broad wording forbid practices remote from the draftsmen's contemplation. Legislators often make a statute overinclusive in order to be sure there are no loopholes; we saw an example of this recently in *FDIC v. O'Neil,* 809 F.2d 350, 352 (7th Cir.1987). But even read literally, section 302 does not carry the day for the pension fund. The specific terms on which hours are to be credited are set out in detail and in writing in section 1.25 of the plan agreement, which can of course be considered along with the collective bargaining agreement in deciding whether the statutory requirement has been satisfied. *Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254, 1263 (9th Cir.1984). No writing, however detailed, can eliminate all questions of interpretation; the existence of a large body of case law arising from disputes over the meaning of the Internal Revenue Code shows this. The existence of an interpretive question does not preclude the pension fund from accepting employer contributions.

■ It is true, but not helpful to the fund, that the statutory requirement of a detailed written basis for pension and welfare benefits appears to have been intended not only to back up the statute's anti-bribery and anti-extortion policies but also to limit the discretion of unions in administering such funds, lest union officers use the discretion to punish their enemies and reward their friends. See 93 Cong.Rec. 4746–47 (1947); *Denver Metropolitan Ass'n v. Journeyman Plumbers & Gas Fitters Local No. 3,* 586 F.2d 1367, 1372–73 (10th Cir.1978). How detailed is detailed enough is not discussed in the cases; but section 1.25 of the plan agreement in this case is detailed enough to transform a dispute over the exercise of discretion (a dispute the persons vested with the discretion are almost certain to win) into a dispute over the meaning of a document, a dispute susceptible of objective resolution by a court or arbitrator. That, we believe, is sufficient detail to satisfy the statute. And in fact this case involves no exercise of discretion by the fund's managers or anyone else connected with the union.

If the fund's statutory argument were accepted, employees would find it hard to qualify for pensions from union funds. For any time the pension plan was not absolutely crystalline in its application to an employee's situation, the fund would refuse to accept contributions and he would therefore fail to qualify. Such an interpretation of section 302 would throw an unintended monkey wrench into the operation of union pension plans and would endanger the pension rights of many employees covered by such plans.

The collective bargaining agreement provided an adequately detailed written basis for Levy to contribute to the fund for the 4 weeks pay that it gave Tyson in 1982. Whether, with this contribution, he is entitled to the pension is a question of contractual interpretation that the district court did not answer. The court did say that since the fund could not credit the contribution to 1981, it would not be acting irrationally in crediting it to 1982; but with the premise removed, the conclusion falls. Indeed, but for the statute the fund would apparently have no objection to crediting the payment to 1981—though since the contribution was never made, the fund has

never had occasion to decide what year to credit it to.

We hold only that the statute is not a bar to Tyson's claim. We remand the case for a determination of his contractual entitlement.

REVERSED AND REMANDED, WITH DIRECTIONS.