**SUNDSTRAND CORPORATION, et al., Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 93–2250.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 3, 1994.

Decided Feb. 22, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied April 8, 1994.

Francis D. Morrissey, James M. O'Brien, Baker & McKenzie, Chicago, IL, John C. Klotsche (argued), Robert H. Albaral, Owen P. Martikan, Neil D. Traubenberg, Baker & McKenzie, Dallas, TX, for petitioners-appellants.

Gary R. Allen, Bruce R. Ellisen, Frank P. Cihlar (argued), Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for respondent-appellee.

* Hon. Michael M. Mihm of the Central District of Illinois.

Before POSNER, Chief Judge, ROVNER, Circuit Judge, and MIHM, District Judge.*

POSNER, Chief Judge.

Ordinarily when a taxpayer repays money that he had previously received as income and included in his gross income in the year of receipt, he can deduct the payment from his current income in figuring his current income tax liability but he cannot go back and recompute his tax liability for the year in which he received the money that he is now repaying. Money received under a claim of entitlement to it as income *is* income for purposes of the federal income tax even if the claim is defeasible and eventually defeated. E.g., *North American Oil Consolidated v. Burnet,* 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197 (1932); *United States v. Lewis,* 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560 (1951); *Continental Illinois Corp. v. Commissioner,* 998 F.2d 513, 521 (7th Cir. 1993). But there are exceptions, one created by section 1481 of the Internal Revenue Code, which though repealed in 1990 applies to taxable years before the repeal. We are asked to decide whether a defense contractor that agreed to repay hundreds of millions of dollars to the government pursuant to the Truth in Negotiations Act, 10 U.S.C. § 2306a, and OMB's Cost Accounting Standards, 48 C.F.R. pt. 9904, can use section 1481 to restate its income for the years (1979 through 1982) in which it received income under contracts negotiated and performed in violation of CAS and TINA. Such a restatement would be more profitable to Sundstrand than deducting the repayments from its current income. The corporate income tax was higher in the contract period than it is today, and a deduction is worth more the higher the tax rate.

Section 1481(a)(1) provides, with respect to any contract (or subcontract, but we can ignore that detail) with a federal agency, that "excessive profits" eliminated as the result of a "renegotiation" shall be used to reduce the contract price that was used in figuring the contractor's taxable income in the year that the contractor received the excessive profits. A "renegotiation" includes "any transaction

which is a renegotiation within the meaning of the Renegotiation Act ..., any modification of one or more contracts with the United States or any agency thereof, and any agreement with the United States or any agency thereof in respect of one or more such contracts." 26 U.S.C. § 1481(a)(1)(A). "Excessive profits" include "any amount which constitutes excessive profits within the meaning assigned to such term by the Renegotiation Act ..., any part of the contract price of a contract with the United States or any agency thereof, ... and any profits derived from one or more such contracts." 26 U.S.C. § 1481(a)(1)(B). The Tax Court, concluding that the adjustments required by CAS and TINA were not the elimination of "excessive profits" by a "renegotiation," refused to recompute Sundstrand's tax liability. 98 T.C. 518, 1992 WL 88529 (1992).

Sundstrand directs our attention to the words (in the definition of "excessive profits") "any part of the contract price of a contract with the United States or any agency thereof," and asks us to read no further. The words, it argues, are clear, so we must not inquire into the history or purpose of the statute. CAS and TINA are the vehicles by which the Defense Department has required Sundstrand to repay a number of items, including expenses for liquor, dog kennels, and servants for executives' spouses, that it had included in the price terms of its contracts. The statute says that excessive profits include any part of any contract price. Therefore the adjustment of the contract price under CAS and TINA eliminated excessive profits. *Q.E.D.*

■ But there is no principle of interpretation that if the meaning of a word, phrase, or sentence plucked out of the heart of a statute seems clear if you do not read or think beyond it you must accept this as the meaning of the statute. On the contrary, taking a word, a phrase, or a sentence out of context is as great a sin in statutory interpretation as it is in ordinary argument. *United States National Bank v. Independent Insurance Agents of America, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993); *Deal v. United States,* —— U.S. ——, ——, 113 S.Ct. 1993, 1996, 124 L.Ed.2d

44 (1993). "Slicing a statute into phrases while ignoring their contexts—the surrounding words, the setting of the enactment, the function a phrase serves in the statutory structure—is a formula for disaster." *Herrmann v. Cencom Cable Associates, Inc.,* 978 F.2d 978, 982 (7th Cir.1992); see also *Moskowitz v. Trustees of Purdue University,* 5 F.3d 279, 283 (7th Cir.1993); *Calderon v. Witvoet,* 999 F.2d 1101, 1104 (7th Cir.1993). But there is context and there is context. *Rowland v. California Men's Colony,* —— U.S. ——, ——, 113 S.Ct. 716, 720, 121 L.Ed.2d 656 (1993). Surrounding sentences are context for interpreting a sentence, but so is the history behind the sentence—where the sentence came from, what problem it was written to solve, who drafted it, who opposed its inclusion in the statute.

The history of a statute can, it is true, be misused. The term "legislative history" picks up some peculiarly unreliable "historical" guides to meaning—the statement of a single legislator, on a day when the chamber may have been empty; a statement not made on the floor at all, but inserted in the record of the proceedings later; a passage in a committee report that may have been inserted by a lobbyist or a committee staff member and not scrutinized carefully by other members of the committee; a passage inserted by an opponent of the bill, designed to impart a particular "spin" to it—or by a proponent, designed as an invitation to a sympathetic court to "restore" a provision that had been deleted in a compromise with opponents. The concern that a number of judges have expressed with regard to the use of legislative history, e.g., *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 395–97, 71 S.Ct. 745, 751–52, 95 L.Ed. 1035 (1951) (Jackson, J., concurring); *United States v. Public Utilities Comm'n,* 345 U.S. 295, 319–20, 73 S.Ct. 706, 719–20, 97 L.Ed. 1020 (1953) (Jackson, J., concurring); *Green v. Bock Laundry Machine Co.,* 490 U.S. 504, 527–28, 109 S.Ct. 1981, 1994–95, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring), though possibly overstated, Stephen Breyer, "On the Uses of Legislative History in Interpreting Statutes," 65 *So.Cal. L.Rev.* 845, 861–69 (1992), dictates caution in its use. But it does not touch the use of "history" in a broader sense to illuminate a

statute that may be ambiguous not because any individual sentence or clause in it is ambiguous but because some of its sentences or clauses don't fit together clearly or don't mesh with rather obvious realities of the subject matter of the statute. *J.C. Penney Co. v. Commissioner,* 312 F.2d 65 (2d Cir. 1962) (Friendly, J.); *Fishgold v. Sullivan Drydock & Repair Corp.,* 154 F.2d 785, 788–89 (2d Cir.) (L. Hand, J.), aff'd, 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946).

As is true here, Sundstrand concedes, of subsection (B) of section 1481(a)(1). Read literally, it makes the settlement of a suit under CAS and TINA a "renegotiation," but not a judgment in the same suit, because "renegotiation" is defined (so far as pertinent here) as an agreement and a judgment is not an agreement. Yet Sundstrand admits that its claim would be unaffected had it fought the government to judgment rather than settling. So "renegotiation" cannot be read literally and this raises the question whether "excessive profits" must be read literally, thus embracing adjustments to contract price made pursuant to CAS and TINA.

Section 1481 has a history, and it is time that we attended to it—a real history, unaffected by any self-serving or tendentious comments in the "legislative history." The statute's definitions of "renegotiation" and "excessive profits" came into the tax laws in the Revenue Act of 1942, ch. 619, § 508, 56 Stat. 965, which was passed shortly after what came to be known as the Renegotiation Act of 1942, ch. 247, §§ 401–05, 56 Stat. 244–47. Enacted just a few months after Pearl Harbor, the Renegotiation Act was designed to control war profiteering by postponing final decision on defense contractors' allowable profits to calmer times. *Lichter v. United States,* 334 U.S. 742, 767–72, 68 S.Ct. 1294, 1307–11, 92 L.Ed. 1694 (1948); see also 2 Ralph C. Nash, Jr. & John Cibinic, Jr., *Federal Procurement Law* 1997–98 (3d ed. 1980). Contracts could be renegotiated after the war to eliminate profits deemed excessive in light of the complete and accurate cost information that experience would bring to light. The specific concern behind the tax rule later codified in 26 U.S.C. § 1481 was that if, as expected, tax rates rose during the war, a contractor allowed to deduct excessive profits from current income would obtain a windfall measured by the difference between the (lower) income tax that he had paid when he earned the profits and the (higher) value of the deduction from income tax when he repaid the profits to the government. I.T. 3577, 1942–2 Cum.Bull. 163, 165. Of course if the war turned out to be short, and tax rates fell afterward, then, as in this case, it would be the contractor rather than the revenuers that would benefit from restating the contractor's previous income rather than taking a deduction from current income.

At all events the contractor was to redetermine his taxable income for the year in which any profits later deemed excessive had been received; and the definitions at issue in this case were broadly drafted to mirror the breadth of the Renegotiation Act. For example, one way the government was authorized by the act to eliminate excessive profits was to require the contractor to reduce his contract price for the future. Since this mode of elimination did not result in any literal *re* payment—any check writing from the contractor to the government—Congress may have feared that the tax authorities would be uncertain where the excessive profits were that were to be subtracted from the contractor's income in the year in which they had been received. The answer, furnished by the "any part of any contract price" language on which Sundstrand fastens, was that the reduction in the future contract price was the excessive profit that was to be subtracted in the earlier year, necessitating a recomputation of the tax liability for that year. "Renegotiation" had also to be defined broadly so that the recapture of excessive profits might take the form of modifying a current contract rather than changing the terms of the old one retroactively. In drafting broadly to close loopholes, draftsmen create a risk of unintended applications; but the history of a statute can help a court to limit that risk through interpretation. *Tyson v. International Brotherhood of Teamsters,* 811 F.2d 1145, 1149 (7th Cir.1987); *United States v. Falvey,* 676 F.2d 871, 875 (1st Cir.1982). The original of 26 U.S.C. § 1481 was aimed at a specific problem, that of the proper tax treatment of income received under a con-

tract the terms of which were to remain tentative because the parties lacked the time or the information necessary to strike a definitive deal before the contract was performed.

Now consider a contract that is perfectly definite but because of fraud or mistake the promisee is held by a court to be entitled to recover all or part of the contract price. The implication of Sundstrand's position is that the damages awarded to the promisee would constitute "excessive profits" of the promisor, so if the promisee happened to be a federal agency the promisor could restate its income in the year in which the contract price had been received. Were it not that a judgment in a lawsuit is difficult to describe as a renegotiation, modification, or agreement, this result would be consistent with a literal reading of section 1481. But it would make no sense in light of the history and purpose of the statute, a history and purpose that tie it to a distinct class of contracts—those whose terms are tentative when made.

CAS and TINA neither create nor primarily relate to such a class of contracts, being designed, rather, to protect the government against fraud, mistake, misallocation of costs, cost padding, bid-rigging, and other familiar abuses in contracts between private parties and government agencies. 48 C.F.R. § 9904.401–20; Robert C. Gusman, "A Critical Study of the 'Truth in Negotiating Law,'" 54 Cornell L.Rev. 708 (1969). They give the governmental party to the contract additional defenses against efforts at enforcement by the private party. The vindication of a contract party's legal rights is different from the revision of terms avowedly tentative when made, though the effects often are similar; and the fact that the vindication of such rights comes through a process of negotiated settlement rather than through litigation à outrance should not be allowed to obscure the difference. Section 1481 was repealed in the Omnibus Budget Reconciliation Act of 1990, § 11801(a)(37), 104 Stat. 1388–521, as an anachronism—fourteen years after the last renegotiation act had expired—rather than because someone wanted to change the tax treatment of moneys required to be disgorged by defense contractors that had violated the government's rights.

AFFIRMED.