T.C. Memo. 2008-21

UNITED STATES TAX COURT

SOLUTION PLUS, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23774-06X.                    Filed February 5, 2008.

Charles Theodore Henry Dennis III (an officer), for
petitioner.

Don R. Spellman, for respondent.

MEMORANDUM OPINION

ARMEN, Special Trial Judge:  Respondent denied petitioner's

request for tax-exempt status under section 501(c)(3)[1] on the

---

[1]  Unless otherwise indicated, all section references are to
the Internal Revenue Code of 1986, as amended, and all Rule
                                              (continued...)

grounds that: (1) Petitioner was not organized exclusively for exempt purposes; (2) petitioner was not operated exclusively for exempt purposes; and (3) petitioner failed to establish that it did not operate for a substantial nonexempt purpose. Pursuant to section 7428, petitioner seeks a declaratory judgment that respondent's denial of its request for tax-exempt status was erroneous and that petitioner qualifies for tax-exempt status under section 501(c)(3). The matter is now before us on respondent's Motion For Summary Judgment.

## Background

Petitioner's only involvement in this case has been to file the petition and a designation of place of submission. See Rules 211(a) and 212. Thereafter, petitioner did not, or would not, participate in stipulating to the administrative record, as defined in Rule 210(b)(12). See Rule 217(a). As a consequence, respondent filed the entire administrative record, appropriately certified as to its genuineness by an official authorized to act for the Commissioner. See Rule 217(b)(1). The following is drawn from that record.

---

[1](...continued)
references are to the Tax Court Rules of Practice and Procedure.

A.  <u>Charles Theodore Henry Dennis III</u>

Charles Theodore Henry Dennis III (Mr. Dennis) formed petitioner as a Maryland corporation on February 15, 2005. Petitioner has not yet begun to operate.

Mr. Dennis's experience and expertise involve debt management programs (DMPs).  A DMP is a program, often run by a credit counseling agency, in which a debtor enrolls to consolidate or restructure and repay unsecured debt.  Creditors pay the entity that runs a DMP a percentage of the debt collected through the DMP.  The financial criteria for qualification of a debtor in a DMP are established by the debtor's creditors.

Before forming petitioner, Mr. Dennis sold DMPs, developed plans to increase his company's DMP portfolio, managed a "high performance call center" for 7 years, and served as a senior loan officer at a mortgage company.  Mr. Dennis has also been a vice president of operations and a call center manager for two companies that provided financial counseling and DMPs.

B.  <u>Articles of Incorporation and Bylaws</u>

Petitioner's articles of incorporation state that its purpose is to "promote financial literacy to highly leveraged consumers who want to become debt free" and "Offer products and services to assist the consumers in reaching their financial goals."

Petitioner's bylaws provide that its specific objectives and purposes are:

1. Establish Solution-PLUS as a viable and beneficial entity in the credit counseling industry through expanded financial services and diversification of revenue.

2. Provide a financial literacy model that focuses on increasing consumer financial awareness and preventing financial distress.

3. Provide a structured debt repayment plan (debt management program) for the immediate and long-term relief of financially overburdened consumers.

4. Establish Solution-PLUS as a reliable corporate community support mechanism for those in need.

## C. Board of Directors and Officers

Petitioner's articles of incorporation and bylaws provide that petitioner shall have two directors. Petitioner's articles of incorporation named Mr. Dennis and his wife as the only directors.

Mr. Dennis is petitioner's president, chief executive officer (CEO), and only employee. Mr. Dennis's compensation is determined, in part, by the growth of petitioner's portfolio of DMPs.

## D. Petitioner's Application for Exemption and Followup Correspondence

### 1. Application for Recognition of Exemption

Mr. Dennis signed petitioner's Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code, and dated it February 25, 2005, a date 10 days

after petitioner's incorporation.  An exempt organization specialist for respondent reviewed the Form 1023 and wrote to petitioner seeking additional information under penalties of perjury about (a) entities (such as banks and lending institutions) to which petitioner planned to refer individuals, (b) whether petitioner would advertise or promote its products or services in any way, (c) whether petitioner would receive any benefit for referring individuals to companies, and (d) whether petitioner had agreements with any such companies.

2.  Petitioner's Response to the Request for Additional Information

a.  General Response

In response to respondent's request for additional information, Mr. Dennis wrote that before petitioner began to actually operate, petitioner wished to obtain exemption under section 501(c)(3) so that it "can launch [its] DMP operating platform and begin the process of originating and servicing DMP Candidates" and begin offering "DMP services on a National scale."  Mr. Dennis stated that petitioner's "goal is to focus initially on offering the best DMP platform in the marketplace" and "strictly put full emphasis on DMP Origination and Servicing" and that petitioner "want[s] to fully concentrate on offering the DMP" and "keep the DMP Service in the forefront."  Mr. Dennis explained that petitioner would be the "sole Service Provider of DMP Origination and Customer Servicing for potential Customers"

and would provide all necessary DMP services, including origination, customer servicing, document processing, research, payment distribution, account reconciliation, and marketing materials. Mr. Dennis stated that petitioner's "goal is to build relationships with participating Creditors of the DMP by ensuring Customer payments are made in a timely fashion and also reaching out to the Creditors for continuous feedback as to how [it] can maintain operational efficiency."

Mr. Dennis explained that petitioner's DMP services would be available to anyone who inquired, as long as they qualified for the DMP, and that petitioner planned to track on a monthly basis how many customers are originated on DMPs. Once petitioner has launched its DMP platform, it will use "traditional advertising that has led to maximum lead generation for the Credit Counseling Industry" and use advertising to "enable further brand recognition". Petitioner could purchase leads for customers as might be necessary to meet its revenue goals. Additionally, petitioner's "goal is to network with organizations that offer Homebuyer Certification Programs" as a "great platform to offer DMP services."

Further, petitioner contemplated having a call center to primarily handle inquiries for DMPs. Petitioner's goal is to have each of its employees answer one new DMP inquiry per hour

and to take approximately eight new DMP inquiries on an average business day.

Petitioner's training materials inform its anticipated future employees that its goal is to provide them with the necessary resources to ensure the success of its clients on DMPs. Petitioner may adopt a bonus structure for its call center employees "in accordance with industry norms." Mr. Dennis made clear that petitioner would identify and service DMP candidates, screen third-party vendors that offer appropriate products and services, and expand the DMP portfolio before referring its customers to such vendors. Mr. Dennis also acknowledged that petitioner might receive referral and marketing fees for generating leads for outside vendors.

Mr. Dennis stated that as petitioner's DMP operation "evolves and becomes more viable," petitioner will begin screening vendors that offer services that complement petitioner's "growing Portfolio of DMP Customers". Petitioner will expose its customers to "various Products and Services - that will complement their short- and long-term financial goals" such as mortgage and insurance products. Petitioner might receive referral fees for marketing these products and services to its potential customers.

Mr. Dennis stated that petitioner also plans to provide information to callers on credit report analysis, properly

utilizing credit, homebuyer certification programs, and financial planning.  Petitioner plans to develop a program of services after identifying the caller's "short-term and long-term financial goals."  Petitioner will tell callers that it provides DMPs and these other programs to improve their overall "Credit Profile".

b.  <u>Telephone Call Center Script and Training Materials</u>

Mr. Dennis attached to his response:  (1) An "origination script" to be used by petitioner's employees who would operate a telephone call center to screen potential DMP applicants; and (2) a training manual.

The script spells out the DMP origination process to prospective customers.  Petitioner first tells callers that it needs to ask them several questions before it can determine their qualification for the DMP.  It then asks if the caller is employed, the type and amount of debts, and whether the debts are current.

Next, petitioner explains that it is a "nonprofit organization providing a free debt management program." Petitioner applies the qualifications for a DMP that the industry and participating creditors establish.  To qualify for a DMP, petitioner tells callers that they must have at least $2,000 in unsecured debts and at least two accounts with creditors participating in petitioner's DMP program.  If a caller meets

these requirements, petitioner tells the caller "we can definitely assist you right away".  Petitioner advises that it will consolidate the caller's unsecured debts, give the caller one place to make payments, and can typically reduce monthly payments.  Petitioner also advises callers that they will receive benefits from their creditors that the callers cannot receive individually.

Next, petitioner requests personal and debt information in order to calculate the caller's monthly payment on the DMP.  Then, petitioner advises the caller that there are no fees to join the program, but asks for a contribution of $5 per creditor per month.  Petitioner tells the caller that the contribution is tax deductible and that petitioner has already included the contribution in the caller's monthly payment amount.

Petitioner then completes a budget worksheet that the "creditors require".  If petitioner determines from the worksheet that the caller has positive disposable income, and the caller says that he or she needs the program because of delinquency, reduction in income, or increase in expenses, petitioner enrolls the caller in a DMP.  If a caller has positive disposable income, but does not cite one of these reasons for needing the program, petitioner tells the caller that creditors may not offer benefits, says that it cannot assist the caller, suggests that

the caller contact his or her creditors directly, and then ends the call.

If petitioner determines that the caller has negative disposable income, but the caller says that he or she thinks the DMP payment is affordable, petitioner enrolls the caller.  If the caller has positive disposable income, but does not think the DMP payment is affordable for some reason, petitioner tells the caller that the program is not right for him or her, to call back if something changes that would enable the caller to afford the program, to call the creditors directly, and then ends the call.

For qualifying callers, the origination script then completes the enrollment process, which includes setting the payment date, account activation, automatic checking account debiting, client agreement, and "keys to success on the DMP". Petitioner ends each call by asking the caller if he or she knows anyone else who might be interested in a DMP and, if so, to have that person call petitioner and seek its assistance.

c.  Educational Materials and Goals

Mr. Dennis stated that petitioner plans to "educate high school and college students on developing and maintaining sound financial management skills" through free seminars and workshops. The planned curriculum will include principles of financial management, debt-to-income ratios, managing credit ratings, and investing.  Petitioner also contemplated a seminar topic and

presentation entitled "On the Right Track", which includes material on understanding credit reports and credit scores, establishing credit, and borrowing techniques. Petitioner received two invitations in 2006 to make presentations on financial management to students.

### 3. Petitioner's Protest

After considering Mr. Dennis's response, respondent advised petitioner that it had been identified as an organization engaging in at least one of the following activities: Credit counseling, credit repair, debt consolidation, financial education, money management, budgeting, or a related financial activity. Respondent provided petitioner with a copy of a comprehensive analysis as to whether entities engaged in these activities can qualify as organizations described in section 501(c)(3). Respondent also provided petitioner with a detailed statement of facts and law as to why it appeared that petitioner did not qualify for tax-exempt status under section 501(c)(3) and gave petitioner 30 days to file a protest.

Petitioner then submitted to respondent a protest stating that its activities would mirror those in Consumer Credit Counseling Serv. of Ala., Inc. v. United States, 44 AFTR 2d 79-5122, 78-2 USTC par. 9660 (D.D.C. 1978), because petitioner's activities contemplated education of the public and its DMP activity was merely incidental. Petitioner attached to its

protest a copy of a one-page handout entitled "Educational Solutions" stating that petitioner has developed an educational curriculum. Petitioner also attached a copy of "Articles of Amendment" purporting to amend its bylaws by removing Mr. Dennis's wife as a director and adding two other individuals as directors.

E. Denial of Petitioner's Application for Exemption

Ultimately, on September 15, 2006, respondent issued a final adverse determination letter, upon which the instant declaratory judgment action is based. In the letter, respondent determined that petitioner did not qualify for exemption under section 501(a) as an organization described under section 501(c)(3) because petitioner: (1) Was not organized exclusively for exempt purposes; (2) was not operated exclusively for exempt purposes; and (3) failed to establish that it did not operate for a substantial nonexempt purpose.

Respondent stated that petitioner's origination script was entirely devoted to selling DMPs and obtaining information about the caller's unsecured debt and that the script did not provide for determining the caller's broader financial situation, assisting the caller in making a budget, or proposing any alternatives to the DMP. Respondent noted petitioner did not provide any of the meaningful educational materials that petitioner claimed to be developing. Respondent further noted

the information provided by petitioner shows that it expected revenue from payments by creditors and from customers who would be attracted to petitioner by traditional advertisements through networks of organizations having members with credit issues. In addition, respondent stated that petitioner had researched companies that would purchase credit counseling leads supplied by petitioner.

F. <u>Proceedings in the Tax Court</u>

Petitioner timely filed the petition seeking a declaratory judgment under section 7428 with respect to its initial qualification for exemption as an organization described under section 501(c)(3). In the petition, petitioner states:

> Solution Plus Inc. is requesting tax exemption status under 501(c)(3) of the Internal Revenue Code. Solution Plus filed form 1023 on February 25, 2005 and did not receive a response until November 11, 2005. In the IRS letter dated November 11, 2005 there was a request for additional information inwhich detailed questions were raised and answered in reference to Solution Plus operations. Solution Plus primary goal is to educate individuals about the pit-falls of improper debt management. Solution Plus was formed to give the general public a fair opportunity to educated [sic] and counsel individuals who are going through hard financial distress. On September 19, 2006, the IRS sent Solution Plus a final denial of tax-exempt status without providing adequate reasons for their denial. Its appears that the IRS is focusing on our use of Debt Management Plans, but the DMP is only a minimal part of Solution Plus revenue. [Reproduced literally.]

As stated above, the petition and designation of place of submission were the last documents that petitioner submitted to the Court in the instant proceeding.

Respondent filed an answer in which he denied the allegations in the petition and to which he attached a complete index to the administrative record. Respondent did not allege in the answer any new or additional grounds for denying petitioner's exemption application beyond those grounds identified in the final adverse determination letter.

Petitioner did not file a reply or move with respect to the answer. The Court ordered the parties to submit the case on the administrative record or to file a written report as to the then present status of the case. As stated above, because petitioner did not respond to respondent's written request to stipulate to the administrative record, respondent filed with the Court the entire administrative record, together with the certificate attesting to its genuineness.

Subsequently, respondent filed his Motion For Summary Judgment. Petitioner was ordered to file a response to respondent's motion, but no response was received by the Court.

Thereafter, the Court issued an Order, placing respondent's Motion For Summary Judgment on a motions calendar assigned to Special Trial Judge Armen, who was authorized to hear the matter and make the decision of the Court. See sec. 7443A(b)(1), (c); Rule 218(a); Deleg. Order No. 45, 126 T.C. VI (June 1, 2006).

At the hearing, counsel for respondent appeared and argued in support of respondent's motion. In contrast, there was no

appearance on behalf of petitioner, nor did petitioner file a written statement pursuant to Rule 50(c) in lieu of appearance.

## Discussion

A. Declaratory Judgment

In a declaratory judgment action brought under section 7428, the Court decides whether the Commissioner's determination was erroneous. See Church in Boston v. Commissioner, 71 T.C. 102, 105 (1978); Houston Lawyer Referral Serv., Inc. v. Commissioner, 69 T.C. 570, 573, (1978); see also Note to Rule 217(a), 68 T.C. 1048.

Disposition of a declaratory judgment action concerning the initial qualification of an exempt organization is ordinarily made on the basis of the administrative record. Church in Boston v. Commissioner, supra at 105; Houston Lawyer Referral Serv., Inc. v. Commissioner, supra at 573.

An action for declaratory judgment may be decided by summary judgment. Rule 217(b)(2); see, e.g., Church in Boston v. Commissioner, supra.

B. Summary Judgment

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials. Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). Summary judgment may be granted with respect to all or any part of the legal issues in controversy "if the pleadings, answers to interrogatories,

depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(a) and (b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994). The moving party bears the burden of proving that there is no genuine issue of material fact, and factual inferences will be made in a manner most favorable to the party opposing summary judgment. See Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985); Jacklin v. Commissioner, 79 T.C. 340, 344 (1982). The party opposing summary judgment must set forth specific facts showing that a genuine question of material fact exists and may not rely merely on allegations or denials in the pleadings. Rule 121(d); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Grant Creek Water Works, Ltd. v. Commissioner, 91 T.C. 322, 325 (1988); King v. Commissioner, 87 T.C. 1213, 1217 (1986).

The Court's decision in an action involving the initial qualification of an exempt organization is ordinarily based on the administrative record. Rule 217(b)(1). In the instant case, neither party has asked the Court to admit evidence outside the administrative record as filed and certified by respondent.

After careful review, we are satisfied that there is no genuine issue as to any material fact, and a decision may be

rendered as a matter of law.  Accordingly, we shall grant respondent's Motion For Summary Judgment.

C.  Whether Petitioner Is Entitled to Exempt Status

A corporation that is organized and operated exclusively for charitable purposes, as described in section 501(c)(3), is exempt from Federal income tax unless exemption is denied under section 502 or 503.  Sec. 501(a).

To qualify as an exempt organization under section 501(c)(3), a corporation must satisfy all of the requirements stated therein, specifically including the requirements that the corporation must be both organized and operated exclusively for one or more exempt purposes specified therein and must not operate for a substantial nonexempt purpose.  Exempt purposes include both charitable and educational purposes.  A failure to satisfy any one of the requirements is fatal to qualification. Columbia Park & Recreation Association v. Commissioner, 88 T.C. 1, 13 (1987), affd. without published opinion 838 F.2d 465 (4th Cir. 1988); see sec. 1.501(c)(3)-1(a)(1), Income Tax Regs.

In a declaratory judgment action commenced under section 7428 to review the Commissioner's denial of an organization's application for initial qualification for tax-exempt status under section 501(c)(3), we ordinarily review only the administrative record.  Rule 217(a); Natl. Association of Am. Churches v. Commissioner, 82 T.C. 18, 19-20 (1984).

1.  Whether Petitioner Is Organized Exclusively for Exempt Purposes

Whether an organization is organized exclusively for exempt purposes is sometimes known as the organizational test.  To satisfy the organizational test, the articles of organization (1) must limit the organization's purposes to one or more exempt purposes; (2) may not expressly authorize the organization to engage in activities that do not further one or more exempt purposes except to an insubstantial degree; and (3) must contain an express or implied provision dedicating its assets to an exempt purpose upon dissolution.  Sec. 1.501(c)(3)-1(b)(1) through (4), Income Tax Regs.

a.  Educational Purposes

Petitioner contends that it satisfies the organizational test because it was organized for educational purposes and that use of DMPs was only a minimal part of its revenue.  However, the administrative record clearly demonstrates otherwise.

Petitioner's articles of incorporation do not limit its activities to those related to education because the articles empower petitioner to engage in activities that are not purely charitable or educational.  For example, petitioner could operate an investment business and offer products and services with respect to a customer's individual needs.  Those activities stand in stark contrast to educational purposes acceptable under section 501(c)(3), which include activities that instruct or

train individuals to improve or develop their capabilities or instruct the public on subjects useful to individuals and that are beneficial to the community. See Am. Campaign Acad. v. Commissioner, 92 T.C. 1053, 1064 (1989); sec. 1.501(c)(3)-1(d)(3)(i), Income Tax Regs.

Petitioner stated that it was in the process of developing free educational pamphlets for its DMP clients that would focus on financial literacy and financial soundness. However, other than a one-page handout, petitioner did not provide respondent with copies of the actual materials that it professed would be provided to consumers, nor did petitioner describe in any detail the content of any such materials. Petitioner's origination script does not mention, describe, or offer to send any educational materials to a caller. The only information that petitioner's script discusses is the sending of literature about petitioner's DMP and associated programs, such as its credit report analysis service. In short, the administrative record does not contain copies of any meaningful educational program or educational materials that petitioner might send to a caller.

Petitioner also stated that it plans to provide seminars and workshops to high school and college students on developing and maintaining sound financial management skills, and it provided outlines of the planned curricula. The invitations indicate that the student audience needs education on financial management and

will benefit from petitioner's program.  However, these student programs are an insignificant part of petitioner's overall activities.

Rather, petitioner's activities are primarily structured to market, determine eligibility for, and enroll individuals in DMPs.  Petitioner plans to inform consumers about the range of financial services it provides, not about understanding the cause of, and devising personal solutions to, consumers' financial problems. Further, petitioner does not plan to consider the particular knowledge of individual callers about managing their personal finances.  Instead, petitioner simply plans to collect data on the callers' debts as necessary to qualify them for a DMP or to determine whether they need other services that petitioner provides.

In short, the record shows that petitioner would not operate primarily for educational purposes and that educational purposes were to be a minimal part of petitioner's proposed activities.

b.  Charitable Purposes

Respondent contends that petitioner was not organized exclusively for charitable purposes.  We agree.

The term "charitable" is used in section 501(c)(3) in its generally accepted sense and includes relief of the poor and distressed or of the underprivileged.  However, primarily providing services for a fee ordinarily does not further

charitable purposes.  See I.H.C. Health Plans, Inc. v. Commissioner, 325 F.3d l188, 1201 (10th Cir. 2003) ("Offering products and services to a broad segment of the population is as consistent with self promotion and profit maximization as it is with any 'charitable' purpose"), affg. T.C. Memos. 2001-246, 2001-247, and 2001-248; Am. Campaign Acad. v. Commissioner, supra at 1076-1077 (beneficiaries must possess "charitable characteristics"); Aid to Artisans, Inc. v. Commissioner, 71 T.C. 202, 215-216 (1978) (disadvantaged artisans constitute a charitable class).  A charitable organization's programs must also benefit the members of a recognized charitable class in a "nonselect manner".  See Am. Campaign Acad. v. Commissioner, supra at 1077; Aid to Artisans, Inc. v. Commissioner, supra at 215-216; sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. (must serve public rather than private interests).  In short, petitioner's potential customers are not members of a class that is benefited in a "nonselect manner"; indeed, petitioner's potential customers are likely to be treated in a "select" manner, because they will be turned away unless they meet the criteria of the participating creditors.[2]

---

[2] We note that in Rev. Rul. 69-441, 1969-2 C.B. 115, the Commissioner indicated that individuals with financial problems are not on that account necessarily in need of assistance as "proper recipients of charity".  We note further that the Commissioner has ruled that an organization formed to help reduce the incidence of personal bankruptcy by informing the public on

(continued...)

## 2. Whether Petitioner Is Operated Exclusively for Charitable Purposes

We focus now on petitioner's operations to decide whether petitioner satisfies the operational test.  Petitioner has not begun to actually operate.  However, its plans make clear:  (a) Petitioner's primary activity would be to provide DMPs to the general public for a fee that it hopes to collect from its customers and from its customers' creditors; (b) petitioner would conduct this activity in a self-promotional and profit-maximizing manner; (c) petitioner would not limit its DMP services to low-income individuals; and (d) petitioner has not established that its proposed DMP fee structure is reasonable.  Thus, the administrative record establishes that petitioner does not, or, more accurately, would not, operate exclusively for charitable purposes.

---

[2](...continued)
personal money management and aiding low-income persons with financial problems by providing free counseling and, if necessary, establishing a budget plan for the orderly discharge of indebtedness, was considered to have furthered charitable purposes. Id. In contrast, the Commissioner has indicated that an organization assisting persons with financial problems by analyzing their specific problems, counseling them on the payment of their debts, and setting up payment plans based on their ability to pay was not exempt under sec. 501(c)(3), because the organization was not engaged in educational activities and did not limit its program to persons who were in need of such assistance as proper recipients of charity.  Id.; Rev. Rul. 65-299, 1965-2 C.B. 165.

### 3. Whether Petitioner Would Not Operate for a Substantial Nonexempt Purpose

An organization is not organized or operated exclusively for exempt purposes under section 501(c)(3) unless it serves a public interest, rather than a private one. Bob Jones Univ. v. United States, 461 U.S. 574, 592 (1983); sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. To satisfy this requirement, the organization must not be organized and operated for the benefit of private interests, such as those of its creator or the creator's family. Am. Campaign Acad. v. Commissioner, 92 T.C. at 1065-1067.

### a. Private Interests of Mr. Dennis

Mr. Dennis controls petitioner. He and his wife were petitioner's only directors at formation and listed on its application for exemption. Mr. Dennis is petitioner's president and CEO, and a full-time employee, indeed, petitioner's only employee. Mr. Dennis's compensation will be based, at least in part, on the growth of petitioner's portfolio of DMPs. Thereby, his pay incentive parallels petitioner's immediate goal to launch its DMP operations to focus initially on offering the best DMP platform in the marketplace, to offer DMP services nationally, to strictly emphasize DMP origination and servicing, to fully concentrate on offering the DMP, to keep the DMP service in the forefront, and to use advertising to enable further brand recognition. The record thus indicates that Mr. Dennis formed petitioner to be a family-controlled business that he personally

would run for financial gain, using his past professional experience marketing DMPs and managing a DMP call center.

Petitioner did not identify any changes to the board in its early submissions to respondent. However, petitioner later represented, as part of its protest, that the board had added two new members to replace Mrs. Dennis. However, petitioner did not provide a date for such change, nor did petitioner provide board minutes or other documentation, such as certification of amended articles, to establish the formal change in petitioner's board. Even if two additional members replaced Mrs. Dennis, Mr. Dennis still would benefit from the organization and operation of petitioner.

### b. Private Interests of Creditors

Petitioner only provides its DMP services to callers who satisfy the qualifications established by participating creditors. Petitioner completes a budget worksheet that the creditors require for each of petitioner's clients. In sum, the administrative record establishes that petitioner would operate for the benefit of private interests.

### c. Conclusion as to Operation of Substantial Nonexempt Purpose

Based on undisputed facts in the administrative record, we conclude that petitioner would operate for a substantial nonexempt purpose.

### 4. Petitioner's Other Contentions

Petitioner contends that the facts of this case are substantially similar to those in Consumer Credit Counseling Serv. of Ala., Inc. v. United States, 44 AFTR 2d 79-5122, 78-2 USTC par. 9660 (D.D.C. 1978). We disagree.

In Consumer Credit Counseling Serv. of Ala., Inc., the District Court held that community education and counseling assistance programs were the primary activities, that the plaintiff-agencies were organized and operated exclusively for charitable and educational purposes, and that the DMP activity was minimal. In the instant case, the sale of DMPs is the primary reason for petitioner's existence, and its charitable and educational purposes are, at best, minimal. The facts in Consumer Credit Counseling Serv. of Ala., Inc. stand in stark contrast to the facts in the instant case.

### 5. Conclusion As To Denial of Petitioner's Exempt Status

Respondent's denial of petitioner's tax-exempt status must be upheld and respondent's motion granted if respondent prevails on any one of the three grounds for disqualification identified in respondent's final adverse determination letter. See Columbia

Park and Recreation Association v. Commissioner, 88 T.C. at 13; sec. 1.501(c)(3)-1(a)(1), Income Tax Regs. Respondent has prevailed on all three grounds for disqualification. Thus, we hold that respondent's determination that petitioner does not qualify for tax-exempt status under section 501(c)(3) was not erroneous and that respondent is entitled to summary judgment.

To reflect the foregoing,

An order granting respondent's Motion For Summary Judgment and decision for respondent will be entered.