# United States Tax Court

T.C. Memo. 2025-106

COACHES 101 A NJ NONPROFIT,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 8630-23X.                    Filed October 15, 2025.

_____

Omar Dyer (an officer), for petitioner.

*Ehsan A. Ali*, *Erika B. Cormier*, and *Marie E. Small*, for respondent.


## MEMORANDUM OPINION

NEGA, *Judge*: This case is before the Court on respondent's Motion for Summary Judgment (respondent's Motion) filed July 8, 2025. On April 5, 2023, respondent issued a final adverse determination to petitioner finding that it is not exempt from federal income tax under section 501(a)[1] because it is not an organization described in section 501(c)(3). Petitioner filed its Petition on May 15, 2023, seeking a declaratory judgment, pursuant to section 7428(a)(1)(A) and Rule 210(c), that respondent erred in his determination. Respondent concedes that petitioner exhausted all administrative remedies. *See* § 7428(b)(2); Rule 211(g)(4). For the reasons stated below, the Court will grant respondent's Motion and sustain the final adverse determination.

_____

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All amounts are rounded to the nearest dollar.

**[\*2]**  When the Petition was filed, petitioner's principal office was in New Jersey; absent stipulation to the contrary, appeal would lie to the U.S. Court of Appeals for the Third Circuit.  *See* § 7482(b)(1)(D), (2).

*Background*

On September 16, 2024, after the parties were unable to stipulate to the Administrative Record, respondent certified and filed the Administrative Record pursuant to Rule 217(b)(1).  On September 25, 2024, petitioner filed its Motion to Supplement the Record.  The Court denied that Motion to Supplement the Record on October 10, 2024.  On November 4, 2024, petitioner filed two additional Motions to Supplement the Record.  Those Motions to Supplement the Record were denied on December 19, 2024.  For purposes of this proceeding, the facts and representations in the Administrative Record are accepted as true and incorporated herein.  *See* Rule 217(b)(1).

Petitioner was incorporated on March 20, 2007, as a domestic nonprofit corporation under the laws of the State of New Jersey.  The Certificate of Incorporation lists Omar Dyer as the registered agent, the incorporator, and an initial member of the board of trustees of petitioner.  Several items listed on the face of the Certificate of Incorporation, including the means of distributing the assets of the organization, are described as being set forth only in petitioner's bylaws.  Its business purpose is described as "a publication . . . to help children in all areas, whether it is childrens [sic] books or getting high school students into college.  Coaches 101 is about getting the children the right education to play in sports and conitue [sic] with there [sic] careers."

Petitioner's undated bylaws state that it is "organized exclusively for charitable purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under section 509(a)(1) and 170(b)(1)(A)(vi), or the corresponding section of any future federal tax code."  However, the section titled "Specific Objectives and Purposes" explains that petitioner's purpose in raising and distributing money is to advance "the aims and goals of the My Plan Challenge Foundation Fund."  The bylaws also provide under the "Distribution of Assets" heading:

> Upon the dissolution of this corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation shall be distributed for one or more exempt purposes within the meaning of

[*3]     Section (c)(3) [sic] of the Internal Revenue Code or shall be distributed to the federal government, or to a state or local government, for public purpose. Such distribution shall be made in accordance with all applicable provisions of the laws of [the State of New Jersey].

Confusingly, the bylaws reference a board of directors, in contrast to the board of trustees, and contain a restriction requiring that members of that board have "direct lineage to Omar Dyer and his immediate family." A document titled "Profit Sharing Agreement / Employment" adds further confusion by assigning conflicting roles to the board of trustees and a board of directors but does not appear itself to be part of the bylaws.

Despite its incorporation in 2007, petitioner purportedly remained dormant until July 2020. Restrictions during the COVID–19 pandemic that required petitioner's founder, Mr. Dyer, to remain at home led to a renewed interest in petitioner. On July 10, 2020, Mr. Dyer, on behalf of petitioner, filed Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code, with the Internal Revenue Service (IRS) seeking recognition of exempt status for petitioner. The application describes petitioner as "a family owned organization" and reiterates the same familial restriction found in the bylaws that affects board of trustee membership.

The application explains that petitioner "was basically organized to act as the license holder of Omar Dyer as a literary agency." It further explains that on January 1, 2020, Mr. Dyer created a "social media based foundation" called "My Plan Challenge Foundation Fund" with the goal of pursuing blogs, podcasts, and other entertainment media related to Mr. Dyer's Mad Comedian project. The application states: "The future plans of this company is [sic] to be a foundation that is directed around the new face of the company in Mad Comedian."

At some point, as the application notes, Mr. Dyer "changed his status from a volunteer to actual employee getting wages." It also explains that petitioner maintains a "Profit Sharing Program" (PSP) and Simplified Employee Pension Plan (SEP IRA) for the benefit of its employees. As described, the PSP provides that "executive employees will be have [sic] an agreement with the organization for personal funds used by the organization, and given back to the employee once when the organization creates a profit." The specific agreement between

[*4] petitioner and Mr. Dyer provides that "[a]ny and all profits after expenses . . . are eligible for profit-sharing. Profits will be calculated as sales operations for that period minus expenses for that time period . . . ."

On October 30, 2020, the State of New Jersey, Department of the Treasury, reinstated petitioner to resume business in the state; Mr. Dyer was listed as president of petitioner, but no longer a trustee. On November 17, 2020, Mr. Dyer, under penalty of perjury, signed Letter 1312, Information Request First Request, stating he was "an officer, director, trustee, or other governing body member (not an authorized representative)," in response to an October 23, 2020, inquiry from the IRS with regard to the Form 1023 submitted by petitioner.

On April 5, 2023, the IRS issued a final adverse determination to petitioner finding that it does not qualify for federal income tax exemption under section 501(a) as an organization described in section 501(c)(3). Respondent noted petitioner's organization is not organized or operated for an exempt purpose. Specifically, the IRS's final adverse determination found:

> [Petitioner's] activities involve a substantial amount of commercial activities including the sale of merchandise (sneakers, books, etc [sic]), marketing services (including advertising services with a $9.99 subscription fee), media production, stock investing, and insurance services.

> [Petitioner] appear[s] to be engaged in inurement and/or private benefit with [its] founder in that [it] reported studen [sic] loan cancellation income on [its] return, [it] claim[s] to hold a license, service mark and perhaps other intellectual property rights of the founder in relation to the founder's Mad Comedian and Fan DJ endeavors among others, and [its] founder intends to report any royalty income on [its] return.

On May 15, 2023, petitioner filed its Petition seeking a declaration with respect to its initial qualification as an organization described in section 501(c)(3) that is exempt from tax under section 501(a). The Petition also raises claims related to other purported notices giving rise to additional causes of action, which the Court has previously dismissed for lack of jurisdiction. On May 2, 2024, respondent filed his

**[\*5]** Answer to which he attached a complete index to the Administrative Record.

On July 8, 2025, respondent filed the present Motion contending that as a matter of law petitioner is not entitled to a declaratory judgment. On July 9, 2025, the Court ordered that on or before August 11, 2025, petitioner, if it disagrees with respondent's Motion, must "point out the specific points in dispute" and if it "disagrees with respondent's argument as to the law, then any such response should also set forth petitioner's position on the disputed legal issues." Because petitioner is not represented by counsel, the Court provided a letter to petitioner with the contact information of local tax clinics that might assist petitioner in responding to the present Motion.

On July 10, 2025, petitioner filed three separate Responses to respondent's Motion: (1) an Objection to Motion for Summary Judgment (petitioner's Objection); (2) a Brief in Support of Objection to Motion for Summary Judgment (petitioner's Brief in Support); and (3) a First Supplement to Objection to Motion for Summary Judgment (petitioner's First Supplement).[2]

*Discussion*

I.   *Scope of Inquiry and Summary Judgment*

Section 7428(a)(1)(A) confers jurisdiction on the Court to make a declaration regarding a determination by the Commissioner "with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a)." In general, the Court's scope of inquiry is limited to the administrative record and "to the propriety of the reasons given by [the Commissioner] for denying [the taxpayer's] application for exempt status." *Aid to Artisans, Inc. v. Commissioner*, 71 T.C. 202, 208 (1978) (citing *Hou. Law. Referral Serv., Inc. v. Commissioner*, 69 T.C. 570, 573 (1978)); *see also* Rule 217(a). An action for declaratory judgment may be decided by summary judgment. Rule 217(b)(2); *see, e.g.*, *Church in Bos. v. Commissioner*, 71 T.C. 102, 105 (1978); *Sols. Plus, Inc. v. Commissioner*, T.C. Memo. 2008-21, 95 T.C.M. (CCH) 1097, 1100.

---

[2] Petitioner originally filed this Response as a Motion to Vacate Motion for Summary Judgment. By order served August 5, 2025, the Court recharacterized the filing.

**[\*6]**   The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). The Court may grant summary judgment on all or any part of the legal issues in controversy. Rule 121(a)(1). In cases in which judicial review is based solely on the administrative record, a motion for summary judgment and any response in opposition must include a statement of facts with references to the administrative record. Rule 121(j). In deciding whether to grant summary judgment, the Court construes factual materials and draws inferences therefrom in the light most favorable to the nonmoving party. *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). However, the nonmoving party may not rest upon mere allegations or denials in his pleadings but, rather, must set forth specific facts showing that there is a genuine dispute for trial. Rule 121(d); *see Sundstrand Corp.*, 98 T.C. at 520.

II.    *Entitlement to Exempt Status*

Section 501(a) exempts organizations described in section 501(c)(3) from federal income tax. Organizations described therein include "[c]orporations . . . organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual." § 501(c)(3). The requirements that an organization be both "organized" and "operated" exclusively for exempt purposes are referred to as the organizational test and operational test, respectively. *See* Treas. Reg. § 1.501(c)(3)-1(a)(1), (b), (c). An organization that fails to satisfy either test is not entitled to an exemption under section 501(c)(3).[3] *See* Treas. Reg. § 1.501(c)(3)-1(a)(1).

When applying the operational test, the Court may examine any of three aspects of the operation of an organization seeking exemption: (1) the primary activities of the organization, (2) the distribution of earnings from the organization (private inurement), and (3) whether the organization is an "action organization" as defined by the regulations. *See* Treas. Reg. § 1.501(c)(3)-1(c)(1)–(3), (d)(1)(ii). Whether an

---

[3] Application of the operational test alone is sufficient here to establish that petitioner is not entitled to tax-exempt status under section 501(a). The Court need not reach the issue of whether the organizational test is satisfied given our application of the operational test.

[*7] organization satisfies the operational test is a question of fact to be resolved on the basis of all the evidence presented by the record. *See Manning Ass'n v. Commissioner*, 93 T.C. 596, 603 (1989); *Church of Scientology of Cal. v. Commissioner*, 83 T.C. 381, 474 (1984), *aff'd*, 823 F.2d 1310 (9th Cir. 1987). In this case respondent's Motion focuses on the primary activities and private inurement and thus is consistent with the two-pronged approach previously applied by the Third Circuit. *See, e.g., Presbyterian & Reformed Publ'g Co. v. Commissioner*, 743 F.2d 148, 152 (3d Cir. 1984), *rev'g* 79 T.C. 1070 (1982).

### A.    *Petitioner's Primary Activities*

When examining the primary activities of an organization under the operational test, Treasury Regulation § 1.501(c)(3)-1(c)(1) provides:

> An organization will be regarded as operated exclusively for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.

In this context, "exclusively" does not mean "solely" or "absolutely without exception." *See Nationalist Movement v. Commissioner*, 102 T.C. 558, 576 (1994) (quoting *Church in Bos.*, 71 T.C. at 107), *aff'd per curiam*, 37 F.3d 216 (5th Cir. 1994). The "critical inquiry" is whether the primary purpose of an organization's activities is an exempt purpose described in section 501(c)(3) "or whether its primary purpose is the nonexempt one of operating a commercial business producing net profits for [the organization]." *See B.S.W. Grp., Inc. v. Commissioner*, 70 T.C. 352, 356–57 (1978) ("[T]he purpose towards which an organization's activities are directed, and not the nature of the activities themselves, is ultimately dispositive of the organization's right to be . . . exempt from tax . . . ."). The presence of a single substantial nonexempt purpose will preclude exemption from tax under section 501(a) regardless of the number or importance of other truly exempt purposes. *See Better Bus. Bureau of Wash., D.C., Inc. v. United States*, 326 U.S. 279, 283 (1945).

This is not a case that might otherwise require balancing the substantiality of a nonexempt activity against numerous exempt ones; examples of petitioner's profit-driven activities pervade the Administrative Record. Petitioner's commercial ventures apparently

[*8] include selling tickets to live events, selling "credits" for autographing of merchandise, selling "subscriptions" to the "My Plan Challenge," selling purported option contracts, selling books and CDs authored by the organization's founder, and other activities consistent with operating a for-profit business enterprise.

For instance, petitioner's website advertises Mad Comedian shoes, designed by the organization's founder, with one design listed at $189 per pair, but notes there is an additional "auction registration fee attached to the price of the shoe; [sic] of $25 and a $1 processing fee." Nowhere in the description of the shoes is there a hint of any exempt purpose; instead the description notes that Mr. Dyer "created this unique shoe in order to celebrate Mad Comedian's life on social media."

In describing the goals of the My Plan Challenge Foundation, petitioner states that the "main goal" is to "raise close to $1 million dollars selling products" and "to pursue projects that involves [sic] the marke [sic] character and face of the foundation. [sic] Mad Comedian." In turn, a 2017 document titled "Ownership Statement" describing Mad Comedian explains that the "desired outcome" of Mad Comedian is to create a "social media empire to stream content, and produce content." It plans to accomplish this by "produc[ing] and sell[ing] short films, music videos and feature films" including targeted advertisements to a "global market audience." In the description of the activities of Mad Comedian, there is no indication of a proper exempt purpose. In sum, Mad Comedian's activities appear consistent with petitioner's admission on its Form 1023 that, at least in substantial part, petitioner hopes to build a profitable business capable of funding its profit-sharing program.

The Administrative Record reflects that petitioner's primary activities are commercial in character and "that fact weighs heavily against exemption." *B.S.W. Grp., Inc.*, 70 T.C. at 359. Further, "[t]his is not the typical case where an organization, concededly conducting substantial educational, scientific, or charitable activities, also conducts a trade or business related to its exempt functions." *Id.* The only activities petitioner puts forward that could plausibly, taken at face value, qualify as exempt activities are vague assertions it "helped" host an event for children and wrote a handful of recommendation letters for high school students. These do little to overcome the abundant evidence that petitioner's primary activities are commercial ventures designed to earn a profit with no apparent connection to an exempt purpose. *See id.* at 356–57. The Court will sustain respondent's finding that petitioner

**[*9]** fails the operational test, on the basis of the activities it has engaged in and plans to continue in the future.

B.     *Private Inurement of Proceeds of Petitioner*

An organization will likewise fail the operational test "if its net earnings inure in whole or in part to the benefit of private shareholders or individuals." *See* Treas. Reg. § 1.501(c)(3)-1(c)(2). In particular, the organization seeking exempt status must establish that its operation is not "for the benefit of private interests such as . . . the creator or his family." *Id.* para. (d)(1)(ii).

Among the examples provided by the regulations, the following seems markedly applicable:

> *Example 2.* (i) O is an art museum. O's principal activity is exhibiting art created by a group of unknown but promising local artists. O's activity, including organized tours of its art collection, promotes the arts. O is governed by a board of trustees unrelated to the artists whose work O exhibits. All of the art exhibited is offered for sale at prices set by the artist. Each artist whose work is exhibited has a consignment arrangement with O. Under this arrangement, when art is sold, the museum retains 10 percent of the selling price to cover the costs of operating the museum and gives the artist 90 percent.
>      (ii) The artists in this situation directly benefit from the exhibition and sale of their art. As a result, the principal activity of O serves the private interests of these artists. Because O gives 90 percent of the proceeds from its sole activity to the individual artists, the direct benefits to the artists are substantial and O's provision of these benefits to the artists is more than incidental to its other purposes and activities. This arrangement causes O to be operated for the benefit of private interests in violation of the restriction on private benefit in paragraph (d)(1)(ii) of this section. Based on these facts and circumstances, O is not operated exclusively for exempt purposes and, therefore, is not described in section 501(c)(3).

*Id.* subdiv. (iii). On its Form 1023 petitioner states: "The company was basically organized to act as the license holder of Omar Dyer as a literary agency." The example from the regulation appears to mirror

**[\*10]** how petitioner envisions its own operations. By petitioner's admission, it continues to sell Mr. Dyer's works; then apparently those moneys are "waged" back to Mr. Dyer on Form 1099. Further, petitioner freely admits in its application that "[t]he future plans of this company is [sic] to be a foundation that is directed around the new face of the company in Mad Comedian," a fictional character created and owned by Mr. Dyer. This is precisely the type of private inurement expressly forbidden by section 501(c)(3).

Mr. Dyer also admits that certain actions that petitioner took were designed to provide him with a direct personal benefit. What Mr. Dyer terms the Profit (Revenue) Sharing Program[4] was designed with the purpose of allowing him "to be hired as an employee of the company and paid a minimum wage." Yet the structure of the program appears to allow him to draw on the funds of the organization through "cash advances" as he sees fit, without consequence, and on terms preferential to those of other participants. Apparently this was all in an effort to circumvent what he recognizes as "limitations set forth by the tax code, in which I can't benefit personally."

Petitioner's SEP IRA device fares similarly and appears as just another means for assets of petitioner to find their way to Mr. Dyer or his immediate family members. This approach is also evident in petitioner's Form 990, Return of Organization Exempt from Income Tax, for taxable year 2019 where it reported $17,831 of "Student Loan Cancellation" as miscellaneous revenue, apparently related to Mr. Dyer's student loans.

Thus the operation of petitioner results in its earnings flowing directly to its founder, Mr. Dyer, who appears to be the primary beneficiary of its activities, directly or indirectly, and the purpose for its existence. The Administrative Record contains repeated examples of admissions by Mr. Dyer, in his own regard and as president of petitioner, as to private inurement for his benefit, whether by "wages" earned, royalties transferred to him, or simply promotion of his performance career and the sale of his products. As a result, respondent's finding of the potential for substantial private inurement is sustained, precluding any entitlement to exemption under section 501(a).

---

[4] An "Angel Investor Program" is also discussed but, together with the "Revenue Sharing Program" and "Profit Sharing Program," appears to be one concept created by Mr. Dyer to accomplish the same purpose.

**[\*11]** III.  *Petitioner's Objections to Summary Judgment*

Rule 121(d) sets forth that "[t]he nonmovant must respond, setting forth specific facts . . . to show that there is a genuine dispute of fact for trial."  As previously stated, "any response in opposition to a motion for summary judgment must include a statement of facts with references to the administrative record."  Rule 121(j).  Where a party fails to properly address an assertion of fact, the Court may (1) "consider the fact undisputed for purposes of the motion" and (2) "grant summary judgment if the motion and supporting materials (including the facts considered undisputed) show that the movant is entitled to it."  Rule 121(f).  "Disputes over facts that are not outcome determinative do not preclude the entry of summary judgment." *Carpenter v. Commissioner*, T.C. Memo. 2012-1, 103 T.C.M. (CCH) 1001, 1003–04 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), *supplemented by* T.C. Memo. 2013-172.

Despite the Court's warning in the July 9, 2025, Order, none of petitioner's responsive filings appropriately addresses the issues raised in respondent's Motion.  To the extent that the Court understands petitioner's arguments, they are divided roughly along two lines, those in its Objection and First Supplement and those in its Brief in Support.

Turning first to petitioner's Objection and First Supplement, petitioner argues that the notice it received with respect to respondent's filing his Motion was inadequate, that certain purported procedural errors with respect to respondent's choice of counsel were made, and that respondent's Motion improperly relies on extrarecord evidence.

Petitioner's arguments are misguided.  Its argument with regard to extrarecord evidence seems to contend that William M. Paul, Acting Chief Counsel of the IRS, is somehow a "new witness" in this case; this misunderstanding of Mr. Paul's position has no relevance to petitioner's claim.  Petitioner seems similarly confused with the timing and other requirements for filing motions for summary judgment in this Court as it repeatedly cites the Federal Rules of Civil Procedure instead of this Court's Rules (or when referring to the correct Rules does so incoherently).  Regardless, petitioner has not identified any defect in the service of respondent's Motion or that Motion's compliance with our Rules.  Similarly, there is no merit to petitioner's grievances with respondent's choice of counsel to prepare the Motion.

**[\*12]** Petitioner's Brief in Support is equally unhelpful; that document is simply a refiling of petitioner's September 25, 2024, Brief in Support of Motion to Supplement the Record. The Court's October 10, 2024, Order addressed those arguments, and the Court need not revisit them here.

Petitioner has otherwise declined this Court's invitation to address the merits of respondent's Motion and put forward a genuine dispute that would necessitate trial in this case.

IV.   *Conclusion*

Petitioner has failed to adequately respond to respondent's Motion, and the Court could enter a decision against it for that reason alone. *See* Rule 121(d). Nevertheless, the Court has considered respondent's Motion on its merits. The Court's review of the Administrative Record shows that respondent's Motion is well made; his determination that petitioner does not qualify for exempt status as an organization described in section 501(c)(3) was not erroneous. He is entitled to summary judgment as a matter of law.

To reflect the foregoing,

*An appropriate order and decision will be entered.*